United States Court of Appeals,

Fifth Circuit.

No. 93-5553.

JOSLYN MANUFACTURING CO., Plaintiff-Appellant,

v.

KOPPERS COMPANY, INC. and the Louisiana & Arkansas Railway
Company, Defendants-Appellees.

Dec. 28, 1994.

Appeal from the United States District Court for the Western
District of Louisiana.

Before POLITZ, Chief Judge, and GOLDBERG and DUHÉ, Circuit
Judges.

DUHÉ, Circuit Judge:

This is an action for contribution arising under the

Comprehensive Environmental Response, Compensation and Liability

Act (CERCLA), 42 U.S.C. §§ 9601, *et seq.,* and the Louisiana

Environmental Quality Act (LEQA), La.Rev.Stat. 30:2271, et seq.

Appellant Joslyn Manufacturing Company (Joslyn) appeals from

judgment entered following a bench trial and from an order

denying its motion to vacate. We have jurisdiction pursuant to

28 U.S.C. § 1291. For the reasons set forth below, we affirm.

I. BACKGROUND

Joslyn sued T.L. James & Co., Koppers Company, Inc.

(Koppers), Louisiana & Arkansas Railway Company (L & A) and

others. Joslyn sought recovery of response costs and a

declaration of future liability under both CERCLA and LEQA. The

district court granted summary judgment for T.L. James & Co. *See*

*Joslyn Corp. v. T.L. James & Co., Inc.,* 696 F.Supp. 222

1

(W.D.La.1988), *affirmed,* 893 F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 2053 (1991).[1] Joslyn dismissed all remaining parties except Koppers and L & A.

Judge Stagg conducted a four day bench trial, and held that Joslyn was obligated to defend and indemnify L & A for all damages to the property. Joslyn moved to vacate judgment. The district court denied the motion and Joslyn filed this appeal.

## II. FACTS

This litigation involves two contiguous parcels of land in Bossier City, Louisiana and known collectively as the Lincoln Creosoting site. The first parcel contained a wood treatment plant, including buildings, treating and storage tanks, wood treatment cylinders, black storage areas and other equipment. The second parcel contained industry tracks used in conjunction with the wood treatment operations on the first parcel. A chart depicting the relevant history of the parcels is set out in Appendix A.

*A. Wood Treatment Operations*

Lincoln owned the first parcel from at least 1935 to 1950 when it sold the parcel to Joslyn. Lincoln leased portions of the second parcel from L & A beginning in 1938 and continuing through 1950 when it assigned its leases to Joslyn. According to

---

[1] T.L. James & Co. was the owner of 60% of the voting common stock and 100% of the non-voting stock of Lincoln Creosote Company. In *Joslyn Corp. v. T.L. James & Co., Inc.,* we held that CERCLA did not mandate the piercing of the corporate veil in this instance, and therefore affirmed the district court's grant of summary judgment for T.L. James. *See* 893 F.2d at 84.

2

Joslyn, prior to the sale and assignment Lincoln operated four wood treatment cylinders on the first parcel. Lincoln's creosote recovery system allowed raw creosoting chemicals to drip from the treating cylinders to a sump pit located below the system. The system recovered some of the creosote from the sump. The remaining chemicals and waste water were discharged into an open ditch which emptied into a slough at the east end of the second parcel. From the slough, the creosoting chemicals were washed away by rain to the surrounding land areas and waterways. Investigation of the site has revealed substantial creosote contamination in the areas of the ditch and the slough. Joslyn claims that contamination also occurred due to Lincoln's use of creosote to kill weeds, and because of Lincoln's use of creosote residue as a base for roads.

On August 1, 1950, Joslyn bought the first parcel, and the plant and equipment located thereon, from Lincoln. On August 14, 1950, Lincoln[2] assigned its leases on portions of the second parcel to Joslyn. Joslyn executed leases directly with L & A in 1955 and 1967.

The evidence reveals that Joslyn took over all of Lincoln's physical facilities and continued wood treatment operations without interruption. George Bauer, Joslyn's plant manager from 1950 to 1963, testified that "There was a shutdown [of Lincoln] one night and startup the next morning as Joslyn, same people,

---

[2]Lincoln was dissolved in 1952 upon unanimous consent of its shareholders, and is no longer in existence.

same equipment."  Joslyn used creosote and several other chemicals throughout its 19 years of wood treatment operations on the site.  There is no dispute that both Lincoln and Joslyn's wood treatment operations resulted in environmental contamination.

Joslyn continued operations at the plant until December 1969 when it sold the property to Koppers.  Koppers purchased the first parcel from Joslyn in order to remove some of the wood treatment equipment from the property.  Specifically, Koppers sought to acquire two treatment cylinders for use at other Koppers' plants.  These cylinders, which sat on concrete pads, were removed in September 1970 by lifting them off of their supports and placing them on double flat cars.  In addition, Koppers removed railroad ties, tracks, tram cars, frogs and switches.  Koppers also removed the fans and doors from a dry-kiln located on the property.  The trial court determined that at no time during Koppers' ownership did it operate the wood treatment facility, nor did Koppers dismantle the entire plant.

Koppers owned the property until January 1971 when it sold the property to the Myatt family doing business as the Specialty Oil Company.  Thirteen days later, the Myatts transferred ownership to Marvin E. Pollard.  L & A sold the second parcel in March of 1972.  The property then passed through several additional owners, the last of which subdivided the property.

B. Environmental Action

On February 3, 1986, the Louisiana Department of

4

Environmental Quality (DEQ) issued an order against T.L. James, Joslyn, Koppers, L & A and others, requiring that a fence be erected around the perimeter of the site. While Joslyn bore the majority of the fencing cost, L & A—though denying liability for remediation—paid a pro rata share. L & A and Koppers requested a hearing on all matters relating to the February 3, 1986 compliance order issued by DEQ.

On August 2, 1986, the DEQ issued a second order against T.L. James, Joslyn, Koppers, L & A and others ordering them to develop a plan for investigation of the site and for clean up of "problem areas" discovered during the Phase 1 investigation. Koppers and L & A again denied liability and requested a hearing on the compliance order. Joslyn submitted a "remedial investigation work plan" to the DEQ. On November 17, 1988, the DEQ approved the Joslyn work plan. Once again, Koppers and L & A denied liability and requested a hearing in regard to the November 17, 1988 compliance order.

On April 30, 1991, the DEQ issued an order against T.L. James, Joslyn, Koppers, L & A and others to submit a "remedial action plan" and, upon plan approval, to implement the plan. Again, Koppers and L & A denied liability and requested a hearing. On January 17, 1992, Joslyn submitted a "removal action work plan" to the DEQ. Joslyn began clean up of the site on February 28, 1992. In June and July of 1992, Joslyn sought DEQ's permission to stop work at the site. DEQ denied the request and, as of the date of the trial, Joslyn claims that it had expended

5

over $13 million in its clean up of the site.

### III. STANDARD OF REVIEW

Joslyn appeals from judgment entered by the district court after a bench trial on the merits. We review the district court's findings of fact for clear error and legal issues *de novo. F.D.I.C. v. McFarland,* 33 F.3d 532, 536 (5th Cir.1994). However, we may affirm for reasons other than those relied upon by the district court. *Ballard v. United States,* 17 F.3d 116, 118 (5th Cir.1994).

### IV. INDEMNIFICATION OF L & A

As indicated above, Lincoln entered into several leases with L & A. Two of those leases, executed in 1942 and 1949, were assigned by Lincoln to Joslyn. Joslyn leased portions of the second parcel directly from L & A in 1955 and 1967. After reviewing the terms of the indemnity clauses contained in the four leases, the district court held,

> L & A is clearly liable to Joslyn for response costs under CERCLA because L & A is a past owner of parcel 2 of the site and owned this property at the time hazardous substances were disposed. Any amount for which L & A owes Joslyn under CERCLA as a past owner, however, is **MOOT,** because any such amount is **CANCELLED OUT** by the fact that Joslyn is ultimately liable for such amount under the indemnity provisions of the four leases at issue.

(emphasis in original). Joslyn agrees that it is bound by the indemnity clauses contained in the 1955 and 1967 leases it executed with L & A. In addition, Joslyn concedes that it is bound by the indemnification clauses in the 1942 and 1949 leases for all contamination which occurred *after* the August 14, 1950 assignment from Lincoln. The issue before this Court is whether

6

Joslyn, as assignee, is required to indemnify L & A for environmental damage caused by Lincoln prior to the August 14, 1950 assignment. The scope of the assignment must be determined by applying Louisiana law.

A. *Terms of the Indemnification Provision*

The starting point of our analysis must be the language of the leases. The 1942 lease from L & A to Lincoln contained the following indemnification provision,

> Lessee forever shall defend, indemnify as an insurer, and save harmless Carrier from, for and against any and all liability, judgments, outlays and expenses (1st) consequent on any injury, death, damage, loss or destruction (a) suffered or caused by or to any person or property incident to or while being engaged or being used in the doing of whatsoever Lessee attempts hereunder, or while on Premises for any reason whatsoever; or (b) suffered by any person (except Carrier's exclusive employees) or by any property (except Carrier's exclusive property) while in the immediate vicinity or, going to or leaving or being taken by other than Carrier to or from the Premises; (c) caused by or resulting from any condition of or defect in the Premises or any operation by any person whomsoever of any locomotive or car (except resulting form Carrier's sole negligence); or (2) consequent on any sole or concurring, wrongful or negligent act of Lessee or of any of Lessee's officers, agents, employees, servants or contractors; or (3) consequent on any fire howsoever set on the premises.

The 1949 lease contained a similarly broad indemnification provision which provided,

> The Lessee agrees to indemnify the Railway Company and save it harmless from any and all claims and expenses that may arise or that may be made for death, injury, loss or damage, resulting to the Railway Company's employees or property, or to the Lessee or Lessee's employees or property, or to other persons or their property, arising from or happening in connection with or during the occupancy or use of said premises by the Lessee, whether or not caused by the negligence of the Railway Company, and resulting from fire or any other cause, excepting only loss or damage to the premises of the Railway Company, or to rolling stock, or to Lessee's shipments in the course of transportation, when

7

such loss or damage is caused solely by fire set by locomotives operated by Railway Company.

While CERCLA does not permit the avoidance of liability *vis-a-vis* the government, both CERCLA[3] and LEQA[4] specifically recognize the enforceability of indemnification agreements which allocate environmental liability among responsible parties.

The Seventh Circuit recently recognized that a party may contract to indemnify another for environmental liability even though CERCLA was not in existence at the time of contracting. *See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 327 (7th Cir.1994). The broad language of the indemnification agreements at issue herein evince a strong intent by the lessee to indemnify L & A for *all* liability arising in connection with the occupancy or use of the land. We hold that the indemnification agreements were intended to cover all forms

---

[3]*See* 42 U.S.C. § 9607(e)(1),

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. *Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.*

(emphasis supplied).

[4]La.Rev.Stat.Ann. § 30:2276(I) (West 1989),

> Nothing in this Chapter shall bar a cause of action that an owner or operator or any other person subject to liability under this Section or a guarantor has or would have by reason of indemnification, subrogation, or otherwise against any person.

of liability, including liability under CERCLA and LEQA, even though environmental liability under these statutes was not specifically contemplated at the time of contracting. Thus, the question before the Court is whether Joslyn assumed *all* of Lincoln's obligations under the leases, or merely those obligations which arose after the date of the assignment.

*B. Assignment*

The next step in our analysis is to examine the scope of the assignment from Lincoln to Joslyn to determine exactly what was conveyed. Our starting point is the language of the assumption agreement between Joslyn and L & A.

1. Terms of the Assignment

The assumption agreement between Joslyn and L & A, executed on August 14, 1950, provides in relevant part,

> As of the 24th day of July, 1950, the undersigned purchased from Lincoln Creosoting Company, Inc., of Shreveport, Louisiana, subject to your approval, all of its right, title and interest in and to the following contracts:
>
> . . . . .
>
> 2. Lease Agreement dated June 11, 1942, executed by you and said Lincoln Creosoting Company, Inc. covering 2.33 acres, more or less, out of the SW1/4 of Section 21, Township 18 North, Range 13 West, Bossier Parish, Louisiana.
>
> 3. Lease Agreement dated November 11, 1949, executed by you with said Lincoln Creosoting Company, Inc. covering an irregular parcel of land between Mile Post B-104.17 and B-104.41 in Bossier City, Bossier Parish, Louisiana.
>
> Under dates July 24th and 25th, 1950, said Lincoln Creosoting Company, Inc. by letters to you confirmed its said sales and assignments to the undersigned.
>
> If you will approve this purchase and transfer by so indicating on each copy of this letter, an original and four copies of which are enclosed, and return one copy to the

above address, *the undersigned agrees to carry out and perform, as well as to be bound by all the terms and provisions of said Industry Track Agreement of January 16, 1936, and said Lease Agreements of June 11, 1942 and November 11, 1949, all of which are incorporated herein by reference with the same like effect as if copied herein in full.*

(emphasis supplied). In addition to the language contained in the assumption agreement, the 1942 lease contained the following provision,

Every undertaking herein shall have the effect of a covenant. Carrier's undertakings are limited to Carrier's express covenants herein. Carrier's implied covenants are limited to Carrier's estate in Premises. *Covenants herein shall inure to or bind each party's* heirs, legal representatives, *successors and assigns,* but Premises shall not be sublet nor shall Lessee's rights be transferred or assigned voluntarily or involuntarily. Carrier or Lessee may waive any default at any time of the other without affecting or impairing any rights arising from subsequent default....

(emphasis supplied). The 1949 lease contained a similar provision:

The lease shall not be assigned or in any manner transferred nor said premises or any part thereof sublet, used or occupied by any party other than the Lessee, nor for any purpose other than that specified herein, without the written consent of the Railway Company. *The provisions of this lease shall be binding upon any assignee or sub-tenant of the Lessee.*

(emphasis supplied).

Under Louisiana law, an assignee is only bound to the extent of the obligations assumed. *See* La.Civ.Code Ann. art. 1822 (West 1987). While we have been unable to find any Louisiana authority addressing the specific issue at hand, an understanding of the general law of obligations provides us with sufficient guidance to determine how a Louisiana court would decide this issue.

10

Therefore, as an initial matter, we must set out the applicable

rules of obligations gleaned from Louisiana law.

2. Real or Personal Obligation

Louisiana law recognizes two basic types of obligations, and

corresponding rights:  an obligation, and the correlative right

to demand its performance, can be either real or personal.[5]

> [T]he term "real right" under the civil law is synonymous with proprietary interest, both of which refer to a species of ownership.  Ownership defines the relation of man to things and may, therefore, be declared against the world.  A personal right, on the other hand, defines man's relationship to man and refers merely to any obligation one owes to another which may be declared only against the obligor.

*Reagan v. Murphy,* 235 La. 529, 105 So.2d 210, 214 (1958).  In

other words, a personal right is the "legal power that a person

(obligee) has to demand from another person (obligor) a

performance consisting of giving, doing, or not doing a thing."

A.N. Yiannopoulos, *Louisiana Civil Law Treatise, Property* § 203,

at 370 (3d ed. 1991).

The distinction between real and personal obligations is

important when determining whether an obligation has been

transferred.

> A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect.

> But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning the thing.

---

[5]*See* La.Civ.Code Ann. arts. 1763-66 (West 1987).

11

La.Civ.Code Ann. art. 1764 (West 1987); *see also* A.N. Yiannopoulos, *Louisiana Civil Law Treatise, Property* § 210, at 385 (3d ed. 1991),

> From the viewpoint of transferability, obligations are either nontransferable (strictly personal) or transferable, whether actively or passively (heritable and real obligations). From the viewpoint of the nature of the transferee's responsibility, transferable obligations are either heritable or real. Heritable obligations are transferable obligations that result in personable responsibility to the transferee. Real obligations attach to immovable property and do not result in personal responsibility of the obligor. The obligor is thus held to a duty merely in his capacity as possessor and may free himself by abandoning the immovable.

Thus, a real right attaches to the property (movable or immovable) and is automatically transferred to a subsequent successor in interest to the property. The transferability of a personal obligation, in contrast, depends on whether the obligation is classified as "heritable" or "strictly personal."

Louisiana Civil Code Article 1765 defines "heritable obligation" as follows:

> An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor.

> Every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract.

> A heritable obligation is also transferable between living persons.

Article 1766 defines "strictly personal" obligation:

> An obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor.

> When the performance requires the special skill or qualification of the obligor, the obligation is presumed to

12

be strictly personal on the part of the obligor.  All obligations to perform personal services are presumed to be strictly personal on the part of the obligor.

When the performance is intended for the benefit of the obligee exclusively, the obligation is strictly personal on the part of that obligee.

With this background, we must determine whether the indemnity clauses are personal or real obligations, and, if the obligations are personal, whether they are heritable or strictly personal.

3. Classification of Obligation

The indemnity clauses at issue are personal rather than real obligations.  There is no indication that the indemnification agreements were intended to create a real obligation upon the land itself, but rather were intended to bind the lessee personally.[6]  It is also plain that these personal obligations fall into the heritable rather than the strictly personal classification.

Under the Civil Code, all obligations are deemed heritable. *See* La.Civ.Code Ann. art. 1765 (West 1987) ("Every obligation is

---

[6]*See e.g. Leonard v. Lavigne,* 245 La. 1004, 162 So.2d 341, 343 (1964);  *E.P. Dobson, Inc. v. Perritt,* 566 So.2d 657, 659 (La.App.1990),

> Although the lease provisions generally are stated to be binding on the heirs and assigns of the parties, the non-competition agreement does not state that it is a covenant running with the land or binding on future owners of the lessor's other property, nor does the agreement refer to a general plan of development or purport to inure to the benefit of other owners in the area of development.  The restriction is for the benefit of this lessee only;  not for the benefit of any owner in the affected area.  It is personal to the lessee in the operation of lessee's particular business on the leased property.

deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract"). The leases at issue provide no evidence that a contrary result was intended. In fact, there is no indication that performance was intended to be rendered by a specific party, but rather that L & A would be indemnified by the occupier and user of the land. We find that the agreements were heritable as a matter of law. As an important corollary, the right of L & A to be indemnified was also clearly personal. Therefore, L & A is entitled to indemnification even though it is no longer the owner of the land.

## 4. Joslyn's Argument

Before we apply the legal concepts we have set out, it is useful to explore Joslyn's arguments to determine whether it has presented any authority inconsistent with our general understanding of Louisiana law. Joslyn first cites two *common law* commentators for the proposition that its obligations under the assigned lease are prospective from the date of the assignment.

First, Joslyn quotes *Friedman on Leases* for the proposition that privity of estate does not create liability for breaches occurring prior to assignment.[7] While we need not decide the

---

[7]Milton R. Friedman, *Friedman on Leases,* § 7.501c1, at 356-57.

> The assignee's liability created by privity of estate does not include anything that accrued before the assignment. The assignee is not liable for breach by the original tenant or by a prior assignee. Nor is he

14

result under the common law, we note that Joslyn's reliance on this statement is misplaced in that the theory of liability at issue is not based on privity of estate, but rather on contractual liability arising under the terms of the transferred lease.

Joslyn also quotes *American Law of Property* for the proposition that in absence of an assumption agreement, an assignee is not in privity of contract with the lessor, and therefore can only be held liable on the basis of privity of estate.[8]  Once again, reliance on this language is misplaced.  As discussed above, the transfer of the lease from Lincoln to Joslyn was by written assignment.  The assumption agreement was delivered to, and approved by, L & A before the assignment took place.  Therefore, in common law terms, Joslyn's liability arises from privity of contract, not privity of estate.  The common law

> liable for rent payable before the assignment to him, even if this covers a period subsequent thereto.  All this is true, but requires amplification.  An assignee is not personally liable for prior breaches, but he takes the lease subject to forfeiture if the breaches are not cured.

[8]*American Law of Property,* § 9.5, at 365 (1952).

> In the absence of an assumption agreement, the assignee of the covenantor is under no privity of contract liability, so that the only basis for liability on his part is on the basis of privity of estate.  Therefore, as soon as he in turn reassigns the burdened estate he has terminated his privity of estate and so will not be liable for future breaches of the covenant.  Of course, he remains liable for all breaches that occurred during the period of the ownership of the burdened estate, but he is not liable for breaches occurring prior to the time in which he acquired the estate, nor for those occurring subsequent to the date he disposes of it.

15

seems to mirror the civil rule—the scope of liability is determined by the scope of the assumption.[9]

The portions of *Droit Civil Français* quoted by Joslyn are consistent with our understanding of Louisiana law.[10] The French authorities referenced in *Droit Civil Français* concur with

---

[9]*See* Milton R. Friedman, *Friedman on Leases,* § 7.501c2(a), at 360 (3d ed. 1990),

> If the assignee assumes "with the same force and effect as if he had executed the lease as tenant," the assumption includes all liability that had accrued at the time of the assignment, as well as the liability thereafter accruing.

*Id.* at § 7.501c2(b), at 361,

> An assignee's agreement to assume the tenant's obligations is held, without more, to exclude existing breaches and include only obligation accruing subsequent to the assignment. But the amount of relevant authority is small. For this reason the assumption clause should be clear. If it is intended to be prospective it should be made expressly applicable only to the covenants and conditions on tenant's part to be performed and observed from and after a specified time. The assignee will then be clearly under no personal liability for anything that occurred before the assignment.

[10]Aubry & Rau, *Droit Civil Français,* in 2 Civil Law Translations § 176, at 79 (7th ed. 1966),

> The particular successor is not, as such and as of right, directly held liable for the personal obligations of his grantor.

> Thus, under Art. 871, a legatee by a particular title is not liable for the debts of his testator. The acquisition of a thing would entail grave risks if the transferees were held liable for debts related to the thing, without being notified by them.

> A lessor who has stipulated that the lessee will pay all the taxes including the real estate tax can not claim from an assignee of the lease a reimbursement for the payment of taxes due before the assignment.

16

Louisiana law that a successor in interest to an immovable takes those personal obligation of its predecessor which were known and specifically assumed.

5. Application

Having established the analytical framework within which the determination must be made, we briefly summarize our conclusions. First, the indemnification agreements are valid methods of apportioning liability under CERCLA and LEQA among the responsible parties. Second, these indemnification agreements are heritable, personal obligations for which the assignee is responsible only if they were specifically assumed.

We hold as a matter of law the language of the assumption agreement displays the intent of Joslyn to assume all of the obligations of Lincoln under the lease.[11] In the assumption agreement, Joslyn specifically states that

> the undersigned [Joslyn] agrees to carry out and perform, as well as to *be bound by all the terms and provisions* of said Industry Track Agreement of January 16, 1936, and said Lease Agreements of June 11, 1942 and November 11, 1949, all of which are incorporated herein by reference *with the same like effect as if copied herein in full*

(emphasis supplied). This language clearly expresses Joslyn's intent to take over all obligations under the referenced contracts. There is no language of limitation contained in the assumption agreement, and no attempt was made to limit the

---

[11]Where the language of the contract is clear and unambiguous, there is no need to go outside the four corners of the document to determine the parties' intent. *See American Waste & Pollution Control Co. v. Jefferson Davis Parish Sanitary Landfill Comm'n,* 578 So.2d 541, 564 (La.App.1991), *cert. denied,* 581 So.2d 694 (La.1991).

assumption to prospective obligations.  We find as a matter of law that Joslyn accepted a general assignment of the leases and thereby agreed to perform all of Lincoln's obligations thereunder.

6. Solidarity

Having determined that Joslyn assumed all of Lincoln's obligations under the leases, we must next assess the extent of Joslyn's liability to L & A.  Under the Louisiana Civil Code, it is clear that the written assumption agreement between Joslyn and L & A rendered Joslyn liable under the terms of the leases, but did not release Lincoln from liability.  *See* La.Civ.Code Ann. art. 1821 (West 1987),

> An obligor and a third person may agree to an assumption by the latter of an obligation of the former.  To be enforceable by the obligee against the third person, the agreement must be made in writing.
>
> *The obligee's consent to the agreement does not effect a release of the obligor.*
>
> *The unreleased obligor remains solidarily bound with the third person.*

(emphasis supplied).  The solidarity of Lincoln and Joslyn creates a special relationship which renders each of them individually liable for the whole performance.  *See id.* at art. 1794,

> An obligation is solidary for the obligors when each obligor is liable for the whole performance.  A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee.

L & A could therefore, at its option, demand performance under the lease from either Lincoln or Joslyn.  *See id.* at art. 1795.

18

> An obligee, at his choice, may demand the whole performance from any of his solidary obligors.  A solidary obligor may not request division of the debt.
>
> Unless the obligation is extinguished, an obligee may institute action against any of his solidary obligors even after institution of action against another solidary obligor.

*see also id.* at art. 1800,

> A failure to perform a solidary obligation through the fault of one obligor renders all the obligors solidarily liable for the resulting damages.  In that case, the obligors not at fault have their remedy against the obligor at fault.

Under the code, once Joslyn assumed all of the obligations of the lease, without reservation, it became inextricably bound with Lincoln for performance of the lease obligations.  L & A, by approving the assignment of the lease to Joslyn, gained the benefit of having two parties solidarily obligated to perform under the lease.  Under this arrangement, Joslyn made itself liable *vis-a-vis* L & A for Lincoln's performance under the indemnity clause.  While Joslyn would certainly have a right of subrogation against Lincoln, Joslyn—not L & A—assumed the risk of Lincoln's insolvency.  *See id.*  Joslyn cannot be allowed to thwart the terms of the indemnity clause, nor escape its inevitable liability under the code, simply by initiating suit itself.  Had L & A initiated suit to enforce the indemnity clause, Joslyn would be liable to L & A for Lincoln's environmental damage.  The same result must occur where suit is filed by Joslyn.

*C. Novation by the 1967 Lease*

19

For the first time on appeal,[12] Appellant claims that any obligations that it took by assignment from Lincoln were released by L & A upon execution of the 1967 lease. The 1967 lease provided, "This agreement cancels and supersedes agreements between the parties hereto, dated August 14, 1950, and January 15, 1955." Joslyn claims that this language constitutes a novation of the previous leases, and that L & A thereby released it from its obligation under the 1950 assignment and 1955 lease.

_____

[12]"We will consider an issue raised for the first time on appeal only if the issue is purely a legal issue and if consideration is necessary to avoid a miscarriage of justice." *Citizens Nat'l Bank v. Taylor (In re Goff),* 812 F.2d 931, 933 (5th Cir.1987). We will not allow parties to raise issues for the first time on appeal merely because they believe that they might prevail if given the opportunity to try the case again on a different theory. *See id.* (citing *Holiday Inns, Inc. v. Alberding,* 683 F.2d 931, 934 (5th Cir.1982)).

The Supreme Court has afforded a limited exception to this rule. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In *Moses H. Cone,* the Court concluded that, "in view of the special interests at stake and the apparent lack of any prejudice to the parties," the court of appeals had discretion to consider an issue not decided in the district court. *Id.* at 29, 103 S.Ct. at 944.

As explained by the Court, 28 U.S.C. § 2106 gives an appellate court "some latitude in entering an order to achieve justice in the circumstances." *Id.* That section provides:

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

28 U.S.C. § 2106.

20

Notwithstanding the questionable timeliness of this contention, the argument fails on its merits.  Under Louisiana law, a novation must be clear and unequivocal.  La.Civ.Code.Ann. art. 1880 (West 1987).  Even assuming, *ad arguendo,* that the above cited language constitutes a novation of the referenced documents, the language does not constitute a express novation of the 1942 and 1949 leases.  The leases are simply not mentioned. At most, the language effectuated a novation of the assumption agreement, and thereby negated L & A's written approval of the assignment.[13]  Novation of the assignment agreement does not, and cannot, affect the validity or effectiveness of the assignment from Lincoln to Joslyn.  The leases themselves were not novated, nor was the agreement between Lincoln and Joslyn changed. Therefore, Joslyn's duty, as assignee of the 1942 and 1949 leases, was not affected by the purported novation of the 1950 assignment agreement and the 1955 lease.

Even without the assumption agreement, Joslyn and Lincoln were solidarily bound by the assignment.  Without an express novation of the 1942 and 1949 leases, this solidarity is unaffected, and L & A retains the option to seek indemnity from either Joslyn or Lincoln.

V. KOPPERS' CERCLA LIABILITY

---

[13]While in another context the lack of written approval may have given L & A cause to complain about the validity of the assignment, this issue is not before us.  In addition, it is clear that at the time the assignment was completed, valid written approval was given, thus, the subsequent withdrawal of approval is of no moment to our analysis.

The final issue before us is whether Joslyn is entitled to contribution from Koppers. To prevail on this issue, Joslyn must first establish Koppers' liability under CERCLA.

> To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a "facility" as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs.

*Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989). It is undisputed that the site in question is a facility as defined in § 9601(9), that a release or threatened release has occurred and that Joslyn has incurred response costs. Thus, Joslyn's burden is to show that Koppers is a "responsible party" under CERCLA and LEQA.

To be liable as a responsible party under CERCLA, Koppers must fall into one of the categories set out in CERCLA section 107(a), 42 U.S.C. § 9607(a):

> (1) the [present] owner and operator of ... a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ..., and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such persons, from which there is a release, or a threatened release which causes the incurrence of response costs....

Similarly, LEQA imposes liability *in solido* on the following

22

persons:

> All persons who have generated a hazardous substance disposed of at the site, transported a hazardous substance to the pollution source or facility, contracted to have a hazardous substance transported to the pollution source or facility, or disposed of a hazardous substance at the pollution source or facility shall be presumed to be liable in solido by the court for the cleanup of the site....

La.Rev.Stat.Ann. § 30:2276 (West 1989). Under both statutes, Koppers' liability depends on whether a disposal occurred during its ownership of the site. The district court found that no disposal occurred during Koppers' ownership of the site, and therefore held that Koppers was not a responsible party under either statute.

Joslyn makes two arguments that Koppers is a responsible party. First, that Koppers' removal of various equipment from the plant resulted in a "disposal" under *Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568 (5th Cir.1988). Second, that regardless of Koppers' activities on the site, Koppers took the property with knowledge of the environmental problem and should not be able walk away from the problems on the site. This argument is loosely based on CERCLA policy as set out by the Fourth Circuit in *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 845-46 (4th Cir.1992), *cert. denied sub nom., Mumaw v. Nurad, Inc.,* --- U.S. ----, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992).

A. Disposal by Removal of Equipment

In *Tanglewood,* we adopted the definition of disposal set out in RCRA at 42 U.S.C. § 6903(3),

23

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

*Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d at 1573. In *Tanglewood,* we also recognized that "this definition of disposal does not limit disposal to a one-time occurrence—there may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings." *Id.*

The district court found:

> The court finds that the evidence does not establish that Koppers dismantled the entire treatment plant nor does it establish that Koppers allowed any amount of hazardous substances to be discharged onto the site because not a single witness testified to facts of any spillage by Koppers. Joslyn has simply failed to prove by a preponderance of the evidence that Koppers owned or operated the site *at the time of* disposal of toxins.

(emphasis in original). As stated above, factual findings of the district court are reviewed under a clearly erroneous standard. *See F.D.I.C. v. McFarland,* 33 F.3d 532, 536 (5th Cir.1994); *see also, AM Int'l, Inc. v. International Forging Equip. Corp.,* 982 F.2d 989, 998 (6th Cir.1993) (Whether there has been a disposal under CERCLA is a question of fact to be decided by a district court and to be reviewed under the clearly erroneous standard). We must affirm the district court's findings unless we are left with the firm and definite conviction that a mistake has been made. *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 434 (5th Cir.1994).

24

Having reviewed Joslyn's arguments and the relevant portions of the record, we are unable to say that the district court's conclusions were clearly erroneous.  Joslyn's arguments go primarily to the weight and credibility of certain evidence. Weight and credibility assessments are within the province of the trier of fact, and cannot, without more, constitute clear error.

*B. Nurad v. William E. Hooper & Sons Co.*

Joslyn cites *Nurad* for the proposition that Koppers is a responsible party under CERCLA simply by virtue of being a past owner of the contaminated property.  Joslyn would have us read *Nurad* to require a finding of liability regardless whether Koppers introduced hazardous substances to the site or whether a disposal occurred during Koppers ownership of the site.  We do not believe that *Nurad*'s definition of disposal can be read so broadly, and we decline to expand the Fourth Circuit's reasoning to eliminate the disposal element of CERCLA liability.

1. Definition of Disposal

The Fourth Circuit recognized that disposal is a necessary element of liability, but provided the following definition of disposal.

> [W]e hold that § 9607(a)(2) imposes liability not only for active involvement in the "dumping" or "placing" of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was "spilling" or "leaking."

*Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d at 846. Under this definition, the court found that a previous property owner was liable—though it had not actively contaminated the

25

property—because mineral spirits were leaking from underground storage tanks during its ownership of the property.

While we decline to decide whether this circuit should adopt the Fourth Circuit's definition of disposal, Joslyn has failed to show that any hazardous waste "leaked" or "spilled" during Koppers' ownership of the property. The district court specifically found that "There is no evidence that leaking or spilling of hazardous substances occurred during Koppers' brief period of ownership." Joslyn has provided no evidence which would lead us to believe that this determination was clearly erroneous.

2. Policy

Joslyn's final attempt at bootstrapping its claims under the *Nurad* holding arises from the Fourth Circuit's exposition of the policy behind CERCLA.

> It is easy to see how the district court's requirement of active participation would frustrate the statutory policy of encouraging "voluntary private action to remedy environmental hazards." Under the district court's view, an owner could avoid liability simply by standing idle while an environmental hazard festers on his property. Such an owner could insulate himself from liability by virtue of his passivity, so long as he transfers the property before any response costs are incurred. A more conscientious owner who undertakes the task of cleaning up the environmental hazard would, on the other hand, be liable as the current owner of the facility, since "disposal" is not a part of the current owner liability scheme under 42 U.S.C. § 9607(a)(1). The district court's view thus introduces the anomalous situation where a current owner, such as Nurad, who never used the storage tanks could bear a substantial share of the cleanup costs, while a former owner who was similarly situated would face no liability at all. A CERCLA regime which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind.

26

*Id.* at 845-46. Joslyn claims that to allow Koppers—a sophisticated purchaser who knew of the contamination—to escape liability in this situation would frustrate the purposes of CERCLA as set out by the Fourth Circuit.

We decline to follow Joslyn's reasoning for two reasons. First, as stated previously, to be found liable under the CERCLA statutory scheme, a former owner must have owned the property during a period when a disposal occurred. We have already affirmed the district court's finding that a disposal did not occur during Koppers ownership, and we decline to read the disposal requirement out of the statutory scheme.

Second, an even larger policy consideration overshadows the policy elucidated by the Fourth Circuit. In this instance, unlike *Nurad* and the majority of cases on the subject, suit is being brought by a former owner who is the *primary contaminator* of the property. In *Nurad,* suit was brought by the current owner who was not responsible for the contamination. To allow Joslyn to recover under *Nurad's* policy—no avoidance of liability through inaction—flies in the face of the polluter pays principle.

Joslyn—a nineteen year polluter of the site—is proposing a scheme under which it could defray part of its clean-up cost by passing the contaminated property through a series of innocent landowners and then, when the contamination is discovered, demanding contribution from each. Not only does this violate the very policy that Joslyn purports to champion, but it would allow a polluter to escape a portion of its liability by conveying the

27

property while ignoring the contamination which it caused.  While Congress determined to encourage clean-up by holding the current landowner liable for the pollution regardless of fault and then permitting contribution from past polluters, § 9607(a)'s disposal requirement for prior landowners eliminates the legal legerdemain that Joslyn is attempting.

We conclude as a matter of law that Joslyn has failed to carry its burden of showing that a disposal occurred during Koppers' ownership of the property.  Koppers is not a CERCLA or LEQA responsible party, and therefore not liable for any portion of Joslyn's clean-up costs.

## VI. CONCLUSION

For the foregoing reasons, the holding of the district court is AFFIRMED.

## APPENDIX A

| DATE | PARCEL ONE | PARCEL TWO |
|------|------------|------------|
| 1935 | Owned by Lincoln | Owned by L & A |
| 1938 | | April 30<br>Portions leased<br>to Lincoln |

| DATE | PARCEL ONE | PARCEL TWO |
|---|---|---|
| 1942 | | June 11<br>Additional Portions<br>leased to Lincoln |
| 1949 | | November 11<br>Additional Portions<br>leased to Lincoln |
| 1950 | August 1<br>Joslyn purchases | August 14<br>Lincoln assigns its<br>leases to Joslyn |
| 1955 | | January 15<br>Joslyn leases additional<br>portions of the parcel |
| 1967 | | October 12<br>Joslyn leases additional<br>portions of the parcel |
| 1969 | December 1<br>Koppers purchases | |
| 1970 | | By agreement with L & A,<br>Joslyn assigns its 1967<br>lease to Koppers |
| 1971 | Myatt family purchases | |