Revised October 2, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-21102
_____


PEBBLE BEACH COMPANY; SEA PINES COMPANY INCORPORATED,

              Plaintiffs-Appellees-Cross Appellants,

v.

TOUR 18 I LIMITED,

              Defendant-Appellant-Cross Appellee.

----------------------------------------

RESORTS OF PINEHURST INCORPORATED,

              Plaintiff-Appellee-Cross Appellant,

v.

GOLFORMS INCORPORATED; ET AL,

              Defendants,

TOUR 18 I LIMITED,

              Defendant-Appellant-Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
September 14, 1998
Before REYNALDO G. GARZA, KING, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

Defendant Tour 18 I, Ltd. appeals the district court's judgment that it infringed and diluted the plaintiffs' service marks and one of the three golf-hole designs at issue, and it challenges the district court's injunction as vague, punitive, and overly broad. See Pebble Beach Co. v. Tour 18 I, Ltd., 942 F. Supp. 1513 (S.D. Tex. 1996). Plaintiffs Pebble Beach Co.; Resorts of Pinehurst, Inc.; and Sea Pines Co., Inc. cross-appeal, arguing that (1) the district court erroneously held that two of the three golf-hole designs at issue were not infringed or diluted, (2) its injunction is inadequate to bar future infringement, and (3) its denial of an accounting of profits and an award of attorneys' fees was erroneous. See id. We affirm the district court's judgment as modified below.

## I.  BACKGROUND[1]

Defendant-appellant-cross-appellee Tour 18 I, Ltd. (Tour 18) owns and operates a public golf course in Humble, Texas named "Tour 18." Tour 18 began life as a limited partnership that subsequently merged into Tour 18, Inc., which also owns and operates a "Tour 18" public golf course in Flower Mound, Texas. Tour 18 has created these two golf courses exclusively of golf holes copied from famous golf courses across the country. The Tour 18 course in Humble, Texas has three golf holes that are

---

[1]  For a more extensive recitation of the facts, see the district court's opinion. Pebble Beach Co. v. Tour 18 I, Ltd., 942 F. Supp. 1513, 1526-36 (S.D. Tex. 1996).

2

copies of golf holes from golf courses owned and operated by plaintiffs-appellees-cross-appellants Pebble Beach Co. (Pebble Beach); Resorts of Pinehurst, Inc. (Pinehurst); and Sea Pines Co., Inc. (Sea Pines) (collectively, the Plaintiffs).

## A. The Plaintiffs

The Plaintiffs' public courses are all part of expensive, destination golf resorts, which advertise nationally and draw customers from across the country, including Texas.[2] All three courses have hosted prestigious professional golf tournaments, many of which are nationally televised, and have been written up in numerous unsolicited articles, showering the courses with praise. All three courses are consistently ranked among the top golf courses in the United States.

Pebble Beach is located in Pebble Beach, California. Tour 18 copied the fourteenth hole from Pebble Beach Golf Links, one of five courses that Pebble Beach operates in the area. The course is located along the scenic shore of the Pacific Ocean and has been in operation since 1919. Green fees to play the course are $245 for the general public and $195 for guests staying at the resort.

The district court described Pebble Beach's par-five fourteenth hole as a

---

[2] Pebble Beach and Pinehurst presented evidence that approximately five percent of their customers are Texas residents.

3

dog-leg right that is ranked as Pebble Beach's number one handicap hole, identifying it as the most difficult hole on the course.  The 14th Hole is not adjacent to the Pacific Ocean, but it provides golfers with a view of the ocean from the tee box and while walking from the tee box to the green.  Its fairway is lined with tall cypress and oak trees.  One of the most notable features of Hole 14 is the large sand bunker guarding the left side of the green.  In one of its brochures, Tour 18 touts this bunker as "one of the most critical bunkers in golf."

Pebble Beach, 942 F. Supp. at 1528.  While the golf course is famous, the fourteenth hole is not famous among golfers.  It is not the course's signature hole[3] and is not emphasized in Pebble Beach's advertisements and promotional material.  Pebble Beach owns an incontestable federal service-mark registration[4] in the "Pebble Beach" mark for golfing services, but does not have a

---

[3]  "A golf course uses a 'signature' hole as a 'trademark' hole to advertise its course.  Usually a signature hole has a unique design or beauty that sets the hole apart from the rest of the course and makes the hole memorable."  Pebble Beach, 942 F. Supp. at 1528 n.5.

[4]  Where the owner of a registered service mark uses the mark in connection with the services specified for five continuous years after the registration date, the mark is deemed "incontestable."  See 15 U.S.C. § 1065.  Once a mark is incontestable, its registration constitutes conclusive evidence of the registrant's right to exclusive use of the mark in commerce for the services specified, subject only to the seven defenses enumerated in 15 U.S.C. § 1115(b).  See Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1184 (5th Cir. 1980).  In contrast, where a registered service mark has not achieved incontestability, its registration constitutes prima facie evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration.  See id. A contestable registration is subject to "any legal or equitable defense or defect, . . . which might have been asserted if such mark had not been registered."  15 U.S.C. § 1115(a); see also Soweco, 617 F.2d at 1184.

4

federal trademark registration for, or a copyright or design or utility patent on, the design of the fourteenth hole.

Pinehurst is located in Pinehurst, North Carolina. Tour 18 copied the third hole from the Pinehurst No. 2 course, one of seven courses Pinehurst operates in the area. The Pinehurst No. 2 course was designed by Donald Ross, who is considered one of the greatest golf-course architects. The No. 2 course is considered to be his masterpiece. The first nine holes of the course began operation in 1903. Green fees are $145.

The Pinehurst No. 2 course's third hole is a par four with "a natural area of sand interspersed with clumps of wire grass, which is indigenous to the local area, that extends between 200 and 300 yards along the right side of the fairway. Adjacent to the natural area is a sand cart path." Id. at 1529. While the golf course is famous among golfers, the third hole is not. The third hole is not the course's signature hole, and Pinehurst does not emphasize the hole in its advertisements or other promotional material. Pinehurst owns a federal service-mark registration in the "Pinehurst" mark for golf services, but does not have a federal trademark registration for, or copyright or design or utility patent on, the design of the third hole.

Sea Pines is located on Hilton Head Island, South Carolina. Tour 18 copied the eighteenth hole from Harbour Town Golf Links, the most famous of Sea Pines's golf courses. The course was designed by Pat Dye, a preeminent golf-course designer, and Jack

5

Nicklaus, who is considered to be one of the greatest golfers of all time and is also an accomplished golf-course designer. The course is distinguished by the presence of a lighthouse behind the eighteenth green. The course has been in operation since 1969, and construction of the lighthouse was completed in 1970. Green fees are $164.

The lighthouse that can be seen from Harbour Town's par-three eighteenth hole

> is octagonal in shape with red and white striping. While the lighthouse is visible from the tee box and fairway of the 18th Hole, it is not physically on the golf course. The lighthouse is actually situated 100 feet from the 18th green across a small inlet of water leading to the Harbour Town marina. . . . [T]here was testimony at trial that because of the location of the lighthouse, many golfers use it as a target to line up their tee shots. However, according to [the developer of the course], his placement of the lighthouse in relation to the 18th hole was not to create a target for golfers, but to guarantee exposure for the lighthouse on television during professional tournaments.

Id. at 1530. Sea Pines's predecessors built the lighthouse and later sold the physical structure to another company in 1984, which then sold it to Prudential Bache-Fogelman Properties (Fogelman). Sea Pines entered into a licensing agreement with Fogelman to allow Fogelman to use depictions of the lighthouse.

The eighteenth hole of Harbour Town Golf Links is one of the most famous holes in golf and is the course's signature hole. Sea Pines emphasizes the hole in Harbour Town's advertisements and promotional materials. The lighthouse's association with the

6

hole has led to the hole commonly being referred to as the "Lighthouse Hole." Sea Pines does not own a federal service-mark registration for the "Harbour Town" mark. The design of the lighthouse is not protected by a copyright or design or utility patent. Sea Pines does not own a federal service-mark registration for the lighthouse for golfing services. The design of the eighteenth hole is not protected by a copyright or design or utility patent; nor does Sea Pines own a federal trademark registration for the design of the eighteenth hole.

### B. The Defendant

In 1992, Tour 18 opened its golf course in Humble, Texas. The course consists of a collection of replica golf holes from sixteen famous golf courses. The first hole is a replica of the eighteenth hole of Harbour Town Golf Links including a smaller scale, nonfunctioning replica lighthouse. The third hole is a replica of the third hole of the Pinehurst No. 2 course, and the thirteenth hole is a replica of the fourteenth hole of Pebble Beach Golf Links. The Flower Mound, Texas Tour 18 course has a replica of the Harbour Town eighteenth hole including lighthouse as its seventh hole. These replica golf holes were created using topographic maps procured from third parties and videotapes of the golf holes.

Tour 18 markets itself as "America's Greatest 18 Holes." It places advertisements in regional and national publications. In

advertisements and promotional materials, Tour 18 identifies the golf holes that it has copied by using the trademarks of the original courses and refers to the golf holes by common nicknames like the "Lighthouse Hole," the "Blue Monster," and "Amen Corner." It uses the Plaintiffs' marks, "Pebble Beach," "Pinehurst," "Harbour Town," and depictions of the lighthouse, extensively in its advertisements and promotional materials. These materials regularly include pictures of Tour 18's replica lighthouse. The Tour 18 scorecard includes the Plaintiffs' marks to identify the replica golf holes. For example, "Pebble Beach 14" is printed next to the number 13. A picture of the replica lighthouse appears on the back of the scorecard. Tour 18's yardage guide has a picture of its replica lighthouse on the cover and contains descriptions of the golf holes and the history of each copied golf hole. Signage at each hole indicates the golf hole that has been copied and describes the original hole. The sign at the Harbour Town replica refers to it as "The Lighthouse Hole." Additionally, Tour 18 uses the Plaintiffs' marks on its menu at its restaurant, offering "The Harbour Town" hamburger, "The Pinehurst" tuna salad, and "Pebble Beach" French toast.

Tour 18 includes disclaimers on the course and in some advertisements and promotional material. On its scorecard and in its yardage guide, Tour 18 includes the following disclaimer: "The design of this course was inspired by great holes from 16

different golf courses.  None of the courses endorse, sponsor, or are affiliated with Tour 18."  The same disclaimer is on a sign at the first tee.  Additional similar disclaimers are on signs at each golf hole stating, for example, "The design of this hole was inspired by the famous 14th Hole at Pebble Beach.  Tour 18 is not affiliated with, endorsed, or sponsored by Pebble Beach."  A promotional brochure with pictures of the replica golf holes contains the Plaintiffs' marks on the pictures of each replica golf hole and a notice below the last photo stating: "Actual Photographs taken at TOUR 18-Houston."  However, several advertisements and promotional materials do not contain any disclaimers.  For example, an issue of Metro Houston Golfer has a picture of the replica lighthouse on its cover and a detailed Tour 18 advertisement inside, but includes no disclaimer in the magazine.  Also, a Tour 18 mailer which includes a large drawing of the replica lighthouse with the phrase "Harbour Town Golf Links-the Lighthouse Hole" without any disclaimer.

Tour 18 charges green fees of $55 during the week and $75 on weekends.  While not as expensive as the green fees at the Plaintiffs' courses, these green fees are higher than the average green fees at comparable daily-fee courses in the Houston area.

### C. District Court Proceedings

The Plaintiffs filed suit against Tour 18 asserting federal claims under the Lanham Act, 15 U.S.C. §§ 1051-1127, for service-

9

mark and trade-dress infringement, unfair competition, and false advertising.  See Pebble Beach, 942 F. Supp. at 1526.  Under Texas law, the Plaintiffs asserted claims for common-law unfair competition, conversion, and civil conspiracy and for service-mark and trade-dress dilution under the Texas anti-dilution statute, see TEX. BUS. & COM. CODE ANN. § 16.29 (Vernon Supp. 1998). Pebble Beach also asserted a claim for copyright infringement based upon maps used by Tour 18.  See Pebble Beach, 942 F. Supp. at 1526.  Tour 18 counterclaimed under Texas common law for unfair competition, interference with existing and prospective business relations, and civil conspiracy.  See id.

After a bench trial, the district court issued an excellent opinion and entered judgment for the Plaintiffs on their infringement, dilution, and unfair competition claims in relation to Tour 18's use of their names and the image of the lighthouse, and the court entered judgment for Sea Pines in relation to Tour 18's copying of its golf-hole design.  See id. at 1554, 1561, 1567.  The district court entered judgment for Tour 18 on the remainder of the Plaintiffs' claims and entered judgment for the Plaintiffs on all of Tour 18's counterclaims. See id. at 1561-63, 1567-71.  The district court denied the Plaintiffs' requests for damages, an accounting of profits, and attorneys' fees, but it entered an injunction against Tour 18 requiring it to (1) cease using Pebble Beach and Pinehurst's marks, except to inform the public of the golf holes it copied;

10

(2) cease using Sea Pines's marks and images of the lighthouse, without any exceptions; (3) remove the replicas of Sea Pines's lighthouse from both of its courses; (4) include a conspicuous disclaimer in all advertisements, promotional material, and informational guides; (5) maintain the disclaimers on the course; and (6) make no claims of use of original blueprints, maps, or other data in the construction of the course without a disclaimer.  See id. at 1571-78.  The district court has partially stayed the injunction pending appeal in relation to the requirement of removing the replica lighthouses.  Tour 18 and the Plaintiffs now appeal.

## II.  DISCUSSION

Tour 18 appeals the district court's judgment that it infringed and diluted the Plaintiffs' service marks and Sea Pines's trade dress and that it competed unfairly.  Tour 18 also appeals the district court's injunction, claiming that it is overly broad, punitive, and vague.  The Plaintiffs cross-appeal the district court's judgment that Tour 18 did not infringe or dilute Pebble Beach and Pinehurst's trade dress, its injunction as providing inadequate relief, and its denial of an accounting of profits and an award of attorneys' fees.  We consider each issue in turn.

### A.  Infringement

For the Plaintiffs to prevail on their service-mark and

11

trade-dress infringement claims, they must show (1) that the mark or trade dress, as the case may be, qualifies for protection and (2) that Tour 18's use of the mark or trade dress creates a likelihood of confusion in the minds of potential consumers. See Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1117-18 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992); Security Ctr., Ltd. v. First Nat'l Sec. Ctrs., 750 F.2d 1295, 1298 (5th Cir. 1985). A trademark or service mark is "any word, name, symbol, or device or combination thereof" used by a person to "identify and distinguish his or her goods [or services], including a unique product [or service]," from the goods or services of another and "to indicate the source of the goods [or services], even if that source is unknown." 15 U.S.C. § 1127. "'Trade dress' refers to the total image and overall appearance of a product" and "may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." Sunbeam Prods., Inc. v. West Bend Co., 123 F.3d 246, 251 & n.3 (5th Cir. 1997), cert. denied, 118 S. Ct. 1795 (1998). With trade dress, the question is whether the "combination of features creates a distinctive visual impression, identifying the source of the product." Id. at 251 n.3.

The same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed, regardless of whether they are registered or

12

unregistered.  See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-70, 773-74 (1992); see also Sunbeam Prods., 123 F.3d at 251 n.4.  Both are protectible if they are inherently distinctive or have achieved secondary meaning in the public's mind--i.e., if the trade dress or mark "'has come through use to be uniquely associated with a specific source.'"  Sunbeam Prods., 123 F.3d at 253 (quoting Two Pesos, 505 U.S. at 766 n.4); see also Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d 417, 425 n.4 (5th Cir. 1984).[5]  However, trade dress is not protectible and cannot be distinctive if it is functional--i.e., if the design "is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection."  Two Pesos, 505 U.S. at 775; see also Sicilia Di R. Biebow, 732 F.2d at 428-29.  Once a plaintiff's mark or trade dress is found to be protectible, liability for trademark and trade-dress infringement hinges upon whether a likelihood of confusion exists in the minds of potential consumers as to the source, affiliation, or sponsorship of the defendant's product or service due to the use of the allegedly infringing marks or trade dress.  See Society of Fin. Exam'rs v. National Ass'n of Certified Fraud Exam'rs, Inc., 41 F.3d 223, 227 (5th Cir. 1995); Oreck Corp. v. U.S. Floor Sys., Inc., 803 F.2d 166, 170 (5th Cir. 1986).

_____

[5]  See footnote 4, supra, for the procedural effect of registration upon a mark's protectibility.

## 1. Standard of review

We review the district court's conclusions of law de novo and its findings of fact for clear error.  See Joslyn Mfg. Co. v. Koppers Co., 40 F.3d 750, 753 (5th Cir. 1994).  Under the clear error standard, we will reverse the district court only if we have a "definite and firm conviction that a mistake has been committed."  B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1260 (5th Cir. 1971) (internal quotation marks omitted).  However, "the 'clearly erroneous' standard of review does not insulate factual findings premised upon an erroneous view of controlling legal principles."  Johnson v. Hospital Corp. of Am., 95 F.3d 383, 395 (5th Cir. 1996) (citing Johnson v. Uncle Ben's, Inc., 628 F.2d 419, 422 (5th Cir. 1980), vacated on other grounds, 451 U.S. 902 (1981)).  The functionality, distinctiveness, or secondary meaning of a mark or trade dress and the existence of a likelihood of confusion are questions of fact.  See Elvis Presley Enters. v. Capece, 141 F.3d 188, 196 (5th Cir. 1998) (likelihood of confusion); Epic Metals Corp. v. Souliere, 99 F.3d 1034, 1037 (11th Cir. 1996) (functionality); Security Ctr., 750 F.2d at 1297-98 (distinctiveness); American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 13 (5th Cir. 1974) (secondary meaning); see also 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:71 (4th ed. 1998) [hereinafter McCarthy on Trademarks] (functionality).

## 2. Protectible marks and trade dress

The district court considered the Plaintiffs' marks, "Pebble Beach," "Pinehurst," and "Harbour Town," and the image of the lighthouse and found them to be protectible. See Pebble Beach, 942 F. Supp. at 1537-41. In the case of the design of the three golf holes, the district court determined that the configuration of a golf hole is nonfunctional, but it found that only Sea Pines's golf-hole design was protectible. See id. at 1555-61. Tour 18 challenges only the district court's findings that the Sea Pines's golf-hole design is protectible and that Sea Pines has protectible rights in the lighthouse. Tour 18 does not challenge the district court's finding that the Plaintiffs' other marks are protectible. The Plaintiffs challenge the district court's finding that Pebble Beach and Pinehurst's golf-hole designs are not protectible. We consider the golf-hole designs and the lighthouse in turn.

### a. golf-hole designs

Turning first to the district court's traditional trade-dress analysis of Tour 18's challenge to the protectibility of the designs of the Plaintiffs' golf holes, Tour 18 attacks the district court's findings that a golf-hole design is nonfunctional and that Sea Pines's golf-hole design is protectible in that it is inherently distinctive or alternatively has acquired secondary meaning. The Plaintiffs challenge the

15

district court's findings that Pebble Beach and Pinehurst's golf holes are not inherently distinctive and are therefore unprotectible, but they do not challenge its finding that neither golf-hole design has acquired secondary meaning.

### i. functionality

The Lanham Act protects only nonfunctional distinctive trade dress; this limitation "serves to assure that competition will not be stifled by the exhaustion of a limited number of trade dresses." Two Pesos, 505 U.S. at 775. "[A] design is legally functional, and thus unprotectible, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." Id. (citing Sicilia Di R. Biebow, 732 F.2d at 426); see also Sunbeam Prods., 123 F.3d at 251 n.6. "The ultimate inquiry . . . is whether characterizing a feature or configuration as protected will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." Id. at 255 (internal quotation marks omitted) (quoting Sicilia Di R. Biebow, 732 F.2d at 429). Thus, functionality "secures for the marketplace a latitude of competitive alternatives," Taco Cabana, 932 F.2d at 1119, and "balanc[es] the interest in facilitating innovation against the interest in fostering competition in the free market," Sunbeam Prods., 123 F.3d at 255.

A collection of functional features in a product design does

16

not necessarily make the combination of those features functional and therefore unprotectible.  See Sunbeam Prods., 123 F.3d at 256; Taco Cabana, 932 F.2d at 1119.  Where the trade dress of a product consists of a particular configuration of features, the functionality of the design turns on "whether its design as a whole is superior to other designs, not on whether its component features viewed individually each have a function."  Vaughan Mfg. Co. v. Brikam Int'l, Inc., 814 F.2d 346, 350 (7th Cir. 1987) (emphasis added).  In determining whether competition would be stifled, we have considered whether the feature or combination of features is "superior or optimal in terms of engineering, economy of manufacture, accommodation of utilitarian function or performance."  Sicilia Di R. Biebow, 732 F.2d at 429; see also Sunbeam Prods., 123 F.3d at 255.  The Supreme Court has stated the question more generally as whether the trade dress is "'essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage."  Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) (quoting Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 850 n.10 (1982)).

The district court determined that the golf-hole designs at issue here are nonfunctional, noting that there is an "unlimited number of alternative designs" to the Plaintiffs' golf-hole designs and that no evidence indicated that the Plaintiffs'

17

designs are superior to the many available alternatives. See Pebble Beach, 942 F. Supp. at 1556. In finding that competition would not be hindered by protecting the Plaintiffs' golf-hole designs, the district court noted that one of Tour 18's experts testified that protecting the design of the golf holes from copying would not unduly injure competition and that Tour 18's director of marketing testified that a golf course need not copy golf-hole designs in order to be competitive in the Houston market. See id.

Tour 18 first attacks the district court's finding that golf holes are nonfunctional by defining its product as a golf course that provides replicas of famous golf holes. It claims that such a product requires that it be able to copy famous golf holes in order to have any commercial success in delivering its product: a course copying famous golf holes. While Tour 18's product may be a golf course the commercial success of which has been based upon copying golf holes, it nevertheless is still just a collection of golf holes. Features that contribute to the commercial success of a product are not thereby necessarily classed as functional. In Sicilia Di R. Biebow, this court rejected the argument that functionality should be defined in terms of commercial success or marketing effectiveness because such a definition would allow a second comer to copy the protectible trade dress of a product whenever the product became successful and preferred by consumers. See 732 F.2d at 428. Tour 18 argues that in Qualitex

18

the Supreme Court overruled this holding with its citation of Justice White's concurrence in Inwood Laboratories, which stated that "[a] functional characteristic is an important ingredient in the commercial success of the product." See Qualitex, 514 U.S. at 165 (internal quotation marks omitted) (quoting Inwood Lab., 456 U.S. at 863 (White, J., concurring in the result)). However, these two statements are not inconsistent. Justice White's statement is merely an acknowledgment that a functional feature is by definition important to the commercial success of a product because without the functional feature a viable, competitive product could not be produced and because competition would be injured if such a feature were protectible by trademark law. The converse, however, is not true. To define functionality based upon commercial success would allow the second comer to trade on the first comer's goodwill, purely because it would be easier to market his product and not because he could not produce a viable, competitive product. Such a rule does not promote innovation, nor does it promote competition, leaving no reason to narrow trademark protection. The logical extension of this argument would practically obliterate trademark protection for product design because a defendant could always argue that its innovative product is a widget that provides a replica of the most popular or most prestigious widget on the market, thus requiring that the defendant be allowed without further analysis to copy the plaintiff's widget.

19

Tour 18 then argues that every feature of a golf hole and how it is configured affects how the hole plays, making any golf-hole design functional. Without citing any authority, Tour 18 urges a rule that a feature or configuration of features is functional unless "a specific design can be made another way without affecting use, purpose, cost, quality or commercial desirability." This rule is much broader than any applied in this circuit or by the Supreme Court and could conceivably render any design functional because any change would undoubtedly somehow affect cost, use, or commercial desirability. Additionally, the Supreme Court limited its statement that trade dress is functional if the trade dress is essential to the use or purpose of the product or affects the cost or quality of the product with the following language: "that is, if exclusive use of the features [or combination of features] would put competitors at a significant non-reputation-related disadvantage." Qualitex, 514 U.S. at 165. This language makes it clear that any effect must be great enough to significantly disadvantage competitors in ways other than consumer preference for a particular source.

Next, Tour 18 contends that Qualitex imposes as a threshold inquiry in the functionality analysis the question of whether the trade dress serves "any other significant function." See 514 U.S. at 166. It argues that this question must be considered before concerns of competition and available alternative designs

20

can be addressed.  This is a misreading of <u>Qualitex</u>, which held

that, in certain circumstances, color can be a registerable

trademark.  <u>See</u> <u>id.</u>.  Where the Supreme Court uses the language

"without serving any other significant function," it is stating

that color alone may sometimes meet the basic legal requirements

for use as a trademark.  <u>See</u> <u>id.</u> at 166 (citing PATENT AND TRADEMARK

OFFICE, U.S. DEP'T OF COMMERCE, TRADEMARK MANUAL OF EXAMINING PROCEDURE

§ 1202.04(e), at 1202-13 (2d ed. May 1993) (approving

registration of a color that indicates source, provided that

"there is [no] competitive need for colors to remain available in

the industry" and the color is not "functional"), and 1 J.

MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 3.01[1], 7.26,

at 3-2, 7-113 (3d ed. 1994) (noting that the requirements for

protecting a word or symbol as a trademark are that it be (1) a

symbol (2) used as a mark (3) to identify and distinguish one's

goods, but that it not be functional)).  This language in

<u>Qualitex</u>, as supported by its accompanying citations, is just

another way of stating that functionality, with its consideration

of the needs of competition, bars Lanham Act protection to

functional features and configurations, which by definition serve

a <u>significant</u> function other than source-identification.  As

noted earlier, functionality takes into account whether

protecting a particular feature or combination of features would

"hinder competition or impinge upon the rights of others to

compete effectively."  <u>See</u> <u>Sunbeam Prods.</u>, 123 F.3d at 255

21

(internal quotation marks omitted).  Therefore, <u>Qualitex</u> does not create a threshold inquiry in the functionality analysis. Additionally, we have held that nonfunctional trade dress may still have some utility--i.e., serve a function other than source-identification--and still be legally nonfunctional.  <u>See</u> <u>Sicilia Di R. Biebow</u>, 732 F.2d at 429.

Having rejected Tour 18's challenges to the district court's analysis, and after reviewing the evidence, we find that the district court did not clearly err in finding that the Plaintiffs' golf-hole designs are nonfunctional.[6]

## ii.  distinctiveness

Trademarks and trade dress are distinctive and protectible if they serve as indicators of source.  <u>See</u> <u>Taco Cabana</u>, 932 F.2d at 1119-20.  Trademarks and trade dress are classified into the following categories: (1) generic, (2) descriptive, (3)

---

[6]  Tour 18 also argues that the district court failed to consider the aesthetic functionality of a golf hole.  This circuit has rejected the doctrine of aesthetic functionality. <u>See</u> <u>Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.</u>, 791 F.2d 423, 426 n.3 (5th Cir. 1986); <u>Sicilia Di R. Biebow</u>, 732 F.2d at 428-29.  Tour 18 argues that the Supreme Court acknowledged aesthetic functionality in <u>Qualitex</u> with its reference to aesthetic functionality and the <u>Restatement (Third) of Unfair Competition</u>. <u>See</u> <u>Qualitex</u>, 514 U.S. at 170 (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17 cmt. c., at 175-76 (1995)).  However, the ultimate inquiry in aesthetic functionality is the same as utilitarian functionality: "'whether the recognition of trademark rights would significantly hinder competition.'"  <u>Id.</u> (quoting RESTATEMENT, <u>supra</u>, § 17 cmt. c.).  Without deciding the viability of aesthetic functionality in this circuit, we note that, based upon the testimony of Tour 18's witnesses that protecting the golf-hole designs would not burden competition, the golf-hole designs at issue are not aesthetically functional.

22

suggestive, (4) arbitrary, or (5) fanciful.  See Two Pesos, 505

U.S. at 768 (citing Abercrombie & Fitch Co. v. Hunting World,

Inc., 537 F.2d 4, 9 (2d Cir. 1976)); Sunbeam Prods., 123 F.3d at

252.  The last three categories--suggestive, arbitrary, and

fanciful--are inherently distinctive, requiring no additional

showing to be protectible, "'because their intrinsic nature

serves to identify a particular source of a product.'"  Sunbeam

Prods., 123 F.3d at 252 (quoting Two Pesos, 505 U.S. at 768).  A

mark or trade dress is descriptive if it "identifies a

characteristic or quality of an article or service, such as its

color, odor, function, dimensions, or ingredients."  Zatarains,

Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 790 (5th Cir.

1983) (citations and internal quotation marks omitted).  A

descriptive mark or trade dress is protectible only when it has

"acquir[ed] a secondary meaning in the minds of the consuming

public."  Id.  A generic mark or trade dress is never protectible

because it connotes "a particular genus or class of which an

individual [product] or service is but a member . . . , rather

than the more individualized characteristics of a particular

product."  Id. (citations and internal quotation marks omitted).

The district court found that Pebble Beach and Pinehurst's

golf-hole designs were not inherently distinctive because they

were variations on commonplace themes in the design of golf

holes.  See Pebble Beach, 942 F. Supp. at 1557-58.  Sea Pines's

golf-hole design, however, is inherently distinctive according to

23

the district court because the incorporation of the lighthouse adds an "arbitrary source-identifying feature[]."  Id. at 1558.  Additionally, the district court determined that Sea Pines's golf-hole design had acquired secondary meaning in the public's mind.  See id. at 1561.  As to Pebble Beach and Pinehurst's golf-hole designs, the district court found no evidence to support a conclusion that either design had acquired secondary meaning.  See id. at 1560-61.

The Plaintiffs argue that the district court should have found Pebble Beach and Pinehurst's golf holes to be inherently distinctive.  However, Pebble Beach and Pinehurst's golf-hole designs do not fall into any of the three inherently distinctive classifications.  Arbitrary and fanciful marks or trade dress "bear no relationship to the products or services to which they are applied."  Zatarains, 698 F.2d at 791.  The trade dress of Pebble Beach and Pinehurst's golf holes is a configuration of commonplace features of a golf hole and therefore does bear a relationship to the product, a golf hole.  A suggestive mark or trade dress "suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods and services."  Id.  The configurations of the features in Pebble Beach and Pinehurst's golf-hole designs create golf holes and nothing more.  They require no exercise of one's imagination to realize that one

24

is viewing a golf hole. Therefore, the district court did not clearly err in finding that Pebble Beach and Pinehurst's golf-hole designs were not inherently distinctive.[7]

Tour 18 argues that Sea Pines's golf-hole design is not protectible because a golf hole's trade dress is generic and because, even if it is descriptive, the Plaintiffs failed to present evidence that demonstrates that Sea Pines's trade dress has acquired secondary meaning. In general, a golf hole's trade dress may be generic, but Sea Pines's inclusion of the distinctive lighthouse in the design of the golf hole takes it out of the generic classification because it emphasizes the "individualized characteristics" of this particular golf-hole

---

[7] The Plaintiffs argue that their golf-hole designs are unique and therefore inherently distinctive, urging us to equate uniqueness with inherent distinctiveness. However, something that is inherently distinctive is unique, but the converse is not necessarily true. A product may be unique and yet fail to be sufficiently distinctive to indicate source. See 1 MCCARTHY ON TRADEMARKS, supra, § 8:13, at 8-35 to 8-36 ("A product or package feature is not inherently distinctive merely because there is no other product on the market that looks exactly the same."). If uniqueness were the test, then

> [p]resumably, it could be said about the trade dress of any new product that no competitive product combines precisely the same elements in its trade dress. . . . [Such a test] essentially would require a finding of inherent distinctiveness whenever a new product enters the market.

Turtle Wax, Inc. v. First Brands Corp., 781 F. Supp. 1314, 1321 (N.D. Ill. 1991) (citing Blue Coral, Inc. v. Turtle Wax, Inc., 664 F. Supp. 1153, 1163 (N.D. Ill. 1987)); see also Duraco Prods., Inc. v. Joy Plastic Enters., 40 F.3d 1431, 1447-48 (3d Cir. 1994). Thus, uniqueness alone cannot be the test for inherent distinctiveness.

25

design rather than connoting golf holes in general.  See

Zatarains, 698 F.2d at 790.  Therefore, the district court did

not clearly err in finding that Sea Pines's golf-hole design was

not generic.

As Sea Pines's golf-hole design is not generic, it is

protectible if it has acquired secondary meaning.[8]  That a

particular mark or trade dress has acquired secondary meaning can

be proven by a consideration of the following evidence: (1)

length and manner of use of the mark or trade dress, (2) volume

of sales, (3) amount and manner of advertising, (4) nature of use

of the mark or trade dress in newspapers and magazines, (5)

consumer-survey evidence, (6) direct consumer testimony, and (7)

the defendant's intent in copying the trade dress.  See

RESTATEMENT, supra, § 13 cmt. e; see also Duraco Prods., 40 F.3d at

1452; Zatarains, 698 F.2d at 795; 2 MCCARTHY ON TRADEMARKS, supra,

§ 15:30.  While each of these types of evidence alone may not

prove secondary meaning, in combination they may indicate that

consumers consider the mark or trade dress to be an indicator of

source.  See Zatarains, 698 F.2d at 795.  In considering this

evidence, the focus is on how it demonstrates that the meaning of

---

[8]  The district court found that the inclusion of the
lighthouse made such a significant difference that Sea Pines's
golf-hole design is inherently distinctive and thus by definition
not generic.  See Pebble Beach, 942 F. Supp. at 1558-59.  We need
not consider whether Sea Pines's golf-hole design is inherently
distinctive because we affirm infra the district court's finding
that the golf-hole design has acquired secondary meaning.  See
Sunbeam Prods., 123 F.3d at 252-53.

26

the mark or trade dress has been altered in the minds of consumers.  See id.  For example, in the case of advertising, spending substantial amounts of money does not of itself cause a mark or trade dress to acquire secondary meaning, but advertisements may emphasize "the source significance of the designation through prominent use of the [mark or trade dress]" and are therefore likely to alter the meaning of the mark or trade dress in the minds of consumers.  See RESTATEMENT, supra, § 13 cmt. c, at 110.

The district court based its finding of secondary meaning upon Sea Pines's extensive advertising; unsolicited publicity of the trade dress of Sea Pines's golf hole, including the lighthouse, in golf publications; and Tour 18's intent to copy and use the trade dress prominently in its advertising.  See Pebble Beach, 942 F. Supp. at 1559-61.  Tour 18 argues that the district court erred in relying upon the advertising and publicity because they touted the design of the golf hole for its playing qualities and not as a designation of source.  While some of Sea Pines's advertising and publicity does promote the playability of the golf hole, the trade dress of Sea Pines's golf hole, including the lighthouse, is prominently used in the advertising and the publicity of the Harbour Town Golf Links in a manner other than simply to promote the playing qualities of the golf hole.  See id. at 1559-60.  Therefore, the district court did not clearly err in finding that Sea Pines's trade dress had

acquired secondary meaning.[9]

## b.  the lighthouse

Tour 18 does not challenge the protectibility of depictions

of the lighthouse; rather, it challenges Sea Pines's rights in

the lighthouse.  Tour 18 argues that Sea Pines no longer has any

---

[9]  Tour 18 also argues that it presented survey evidence indicating that the Plaintiffs' golf-hole designs had not acquired secondary meaning in the minds of consumers.  Through the testimony of an expert, Tour 18 presented a survey of the public's reactions to pictures of the Plaintiffs' golf holes. The survey was entitled "An Investigation of the 'Inherent Distinctiveness' of Selected Golf Holes."  During its expert's testimony about the survey, Tour 18's counsel asked if the expert had an opinion as to whether Pebble Beach or Pinehurst's golf-hole designs had acquired secondary meaning.  Tour 18's counsel did not ask the same question about Sea Pines's golf-hole design.

This omission implies either that the survey was not probative in relation to whether Sea Pines's golf-hole design had acquired secondary meaning or that the survey would have supported a finding of secondary meaning, an inference not in Tour 18's interests.  Tour 18 chose not to present the survey as probative of whether Sea Pines's trade dress had acquired secondary meaning as evidenced by the omitted question and by its failure to argue no secondary meaning for the Sea Pines's golf-hole design in its closing argument, and we therefore do not find error in the district court's failure to factor in the survey as to this issue.  Additionally, the survey showed that nine percent of active golfers surveyed identified Sea Pines's golf hole in a way indicating source--e.g., "legendary light house hole," "a golf course in Hilton Head, S.C.," and "18th hole harbor [sic] town."  While this may not be enough to establish secondary meaning on its own, see, e.g., Roselux Chem. Co. v. Parsons Ammonia Co., 299 F.2d 855, 862 (C.C.P.A. 1962) (finding 10% to be insufficient to establish secondary meaning); Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 689-90 (S.D.N.Y. 1963) (finding 25% to be insufficient); see also 2 McCARTHY ON TRADEMARKS, supra, § 15:45 n.9 (cautioning against using 25% as a benchmark), it does not negate the showing made by the Plaintiffs, establishing that Sea Pines's trade dress has acquired secondary meaning through evidence of Sea Pines's advertising, unsolicited publicity, and Tour 18's intent.

rights in the lighthouse because (1) it does not own the lighthouse and (2) by its course of conduct, it has abandoned the lighthouse as a mark.  In response to the first argument, we adopt the reasoning of the district court:

> The Lanham Act does not require a party to "own" a word, symbol, or other identifying mark before it may be granted protection from infringement.  Rather, all that is required is that a party "use" the mark in commerce to identify its services and distinguish them from the services of others.  15 U.S.C. § 1127; see [Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1014 (5th Cir. 1975)] (noting that under trademark law, a party acquires rights to a symbol in the public domain through use of the mark and the public's association of the mark with the user).

Id. at 1541 (footnote omitted); see also 1 MCCARTHY ON TRADEMARKS, supra, § 7:100-:101.  Tour 18 styles its argument as attacking Sea Pines's interest in the structure of the lighthouse itself and not in the image of the lighthouse, arguing that the only connection between the golf course and the lighthouse is that the lighthouse can be seen from the course.  However, Harbour Town Golf Links was built by the same entity that constructed the lighthouse and the evidence demonstrates that the placement and design of the course and the lighthouse were specifically designed to create the relationship between the course and the lighthouse.  This is not a case where the only connection is the coincidence of proximity or location.  The connection between the course and the lighthouse is much greater and dates back to the conception of both.  Sea Pines has used depictions of the

29

lighthouse in relation to golfing services since 1969, and the district court did not clearly err in finding that the lighthouse has achieved secondary meaning in relation to golfing services in the minds of consumers. The sale of the lighthouse to Fogelman's predecessor, while reserving trademark rights in depictions of the lighthouse, does not alter this finding.

In relation to abandonment, Tour 18 argues that Sea Pines's failure to police third-party uses of the lighthouse as a mark has caused the mark "to lose its significance as a mark," thus constituting abandonment under 15 U.S.C. § 1127. As Tour 18 argues, this form of abandonment does not require any intent to abandon on the part of Sea Pines. See id.; RESTATEMENT, supra, § 30 cmt. c; 2 MCCARTHY ON TRADEMARKS, supra, § 17:8. However, the evidence shows, as the district court discussed, that Sea Pines has not failed to police third-party uses of depictions of the lighthouse; rather, it has aggressively policed third-party uses. See Pebble Beach, 942 F. Supp. at 1541. Additionally, the district court's finding of secondary meaning in the lighthouse mark for golfing services shows that the lighthouse has not lost its significance as a mark for golfing services, despite the third-party uses in relation to other products and services. Those third-party uses are only relevant to the strength of the mark in this case and do not evidence abandonment. See Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1048 (4th Cir. 1984) (citing 1 J.T. MCCARTHY, TRADEMARKS AND

30

UNFAIR COMPETITION § 17:5, at 779-80 (2d ed. 1984)); RESTATEMENT, supra, § 30 cmt. c; see also Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 259 (5th Cir. 1980); 2 McCARTHY ON TRADEMARKS, supra, § 17:17, at 17-27.

### 3.  Likelihood of confusion

Next we turn to whether Tour 18's use of the Plaintiffs' marks and trade dress infringed the Plaintiffs' rights.  The touchstone of infringement is whether the use creates a likelihood of confusion as to the "source, affiliation, or sponsorship" of Tour 18's golf course.  See Society of Fin. Exam'rs, 41 F.3d at 227; Oreck, 803 F.2d at 170; see also 15 U.S.C. § 1114(1); id. § 1125(a)(1)(A) (imposing liability for uses "likely to cause confusion . . . as to the affiliation, connection, or association of [the defendant] with another person, or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by another person").  Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion.  See Elvis Presley Enters., 141 F.3d at 193.  In determining whether a likelihood of confusion exists, this court considers the following nonexhaustive list of factors: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the

31

identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. See Taco Cabana, 932 F.2d at 1122 n.9; Conan Properties, Inc. v. Conans Pizza, Inc., 752 F.2d 145, 149 (5th Cir. 1985). No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these "digits of confusion." See id. at 150; see also Elvis Presley Enters., 141 F.3d at 194.

While noting that no golfer will stand on the tee at Tour 18 and believe that he or she is playing at Pebble Beach, Pinehurst, or Harbour Town, in considering Tour 18's use of the Plaintiffs' marks and depictions of the lighthouse, the district court found that all seven digits of confusion weighed in favor of a likelihood of confusion as to whether the courses are otherwise affiliated. See Pebble Beach, 942 F. Supp. at 1541-50, 1552. In reaching this determination, the district court considered Tour 18's use of disclaimers and found them to be inadequate where present and to be absent from the majority of advertisements and promotional material. See id. at 1550-52. In relation to Sea Pines's trade dress, the district court also found that the digits of confusion weighed in favor of a likelihood of confusion, partially relying upon its analysis of the likelihood of confusion in relation to the marks and upon the same actual confusion evidence as used in relation to the marks. See id. at

32

1561.

Tour 18 attacks the district court's finding of a likelihood of confusion based upon its consideration of evidence of actual confusion that consumers believed that Tour 18 had obtained "permission" to use the Plaintiffs' marks and to copy their golf holes. Tour 18 argues that "permission" does not include a connotation of control and therefore does not express a relationship that is relevant to confusion as to source, affiliation, sponsorship, or approval. We disagree.

Permission is synonymous with approval and suggests some connection between the parties. The idea that one party has given permission to another implies a form of approval of the other's activities. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1683 (Philip Babcock Gove ed., 1963) (defining "permission" as "the act of permitting : formal consent : AUTHORIZATION" and "permit" as "to consent to expressly or formally"); WILLIAM C. BURTON, LEGAL THESAURUS 30, 383 (2d ed. 1992) (including "consent to" among synonyms of "approve," "permit" among synonyms of "approval," and "approval" among synonyms of "permission"); see also ROGET'S DESK THESAURUS 30, 397 (Joyce O'Connor ed., 1995) (same). For a party to suggest to the public, through its use of another's mark or a similar mark, that it has received permission to use the mark on its goods or services suggests approval, and even endorsement, of the party's product or service and is a kind of confusion the Lanham Act prohibits. See Indianapolis Colts,

33

Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 415-16 (7th Cir. 1994) (finding confusion as to "permission" relevant); Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 772, 775 (8th Cir. 1994) (same); University of Ga. Athletic Ass'n v. Laite, 756 F.2d 1535, 1546 (11th Cir. 1985) (same); Dream Team Collectibles, Inc. v. NBA Properties, Inc., 958 F. Supp. 1401, 1416 (E.D. Mo. 1997) (same). But see Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 786 F. Supp. 182, 202 (E.D.N.Y.) (expressing concern that confusion as to permission may actually only be a measure of the popularity of an established product), vacated on other grounds, 973 F.2d 1033 (2d Cir. 1992). Therefore, confusion as to permission is relevant confusion under the Lanham Act.

The Plaintiffs' survey was conducted among golfers who had played a round of golf at Tour 18. Tour 18 argues that the survey was flawed because, by relying upon "permission," it created the possibility that those surveyed believed that permission was required, thereby skewing the result. But the survey asked whether Tour 18 "did get" or "did not get" permission to use the Plaintiffs' marks or to copy the Plaintiffs' golf holes. This question asks what message Tour 18's use of the Plaintiffs' marks and trade dress conveyed, rather than whether Tour 18 needed to get permission, which would focus on what those surveyed believed to be required. Although, this latter form is more problematic because it allows for the

34

consumer's misunderstanding of the law, rather than the defendant's use of the marks, to be the basis for his belief, it has been accepted by other courts as probative as to confusion. See, e.g., Indianapolis Colts, 34 F.3d at 415 (accepting a survey that asked if a party needed to get another's permission to use the mark at issue); Anheuser-Busch, 28 F.3d at 772, 775 (accepting a survey asking if a party "did have to get permission to use" the mark). But see Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd., 817 F. Supp. 1103, 1122-23 (S.D.N.Y. 1993) (rejecting a survey for asking a leading question: "Do you believe that [the defendant] had to get authorization, that is, permission to use the name . . . ?"), vacated pursuant to settlement, 859 F. Supp. 80 (S.D.N.Y. 1994). Therefore, the district court did not improperly rely upon the Plaintiffs' survey.[10]

In addition to the survey evidence, the district court relied upon the testimony of the witnesses that, before actually

---

[10] We have held in the text that the district court did not err in relying upon the Plaintiffs' survey asking whether permission was obtained. However, we note that "approval" is a word with an easily understood everyday meaning that could have been used just as easily in the survey or in questions asked of the witnesses. We do not hold here that the unfettered use of "permission," rather than "approval" or other less ambiguous language, is always acceptable, and we caution litigants to consider the language of the survey and questions so that the consumer's belief that permission is required does not skew the results of the survey, thus decreasing its probative value. See Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F.2d 500, 506-07 (5th Cir. 1980); Holiday Inns, Inc. v. Holiday Out In Am., 481 F.2d 445, 447-48 (5th Cir. 1973).

playing the course, they thought Tour 18 had obtained permission to use the Plaintiffs' marks and trade dress; most notably, two witnesses testified that Tour 18's advertising in particular caused their confusion. See Pebble Beach, 942 F. Supp. at 1547-48 & nn.31-32. This confusion was relevant even if it was obviated by playing the course and viewing the holes and disclaimers on the golf course signs. See Elvis Presley Enters., 141 F.3d at 204. Moreover, those disclaimers and signs did not necessarily obviate the confusion as evidenced by the findings of the Plaintiffs' survey of golfers who had played Tour 18 and had been exposed to all of Tour 18's disclaimers on the course. See Pebble Beach, 942 F. Supp. at 1548-50. Additionally, "[e]vidence of actual confusion is not necessary to a finding of a likelihood of confusion." Elvis Presley Enters., 141 F.3d at 203-04 (citing Amstar, 615 F.2d at 263). After reviewing the record, we cannot say that the district court committed clear error in finding actual confusion and in finding a likelihood of confusion based partially upon that actual confusion, resulting from Tour 18's use of the Plaintiffs' marks and trade dress.[11] Cf. Champions

_____

[11] In its reply brief, Tour 18 challenges other aspects of the district court's findings, including its consideration of the intent factor in the likelihood-of-confusion analysis and its partial reliance upon the likelihood-of-confusion analysis of the use of the Plaintiffs' marks in its analysis of the use of Sea Pines's trade dress. Because Tour 18 failed to raise these arguments in its initial brief on appeal, we will not consider them. See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal."). However, we note that neither of the

<u>Golf Club, Inc. v. The Champions Golf Club, Inc.</u>, 78 F.3d 1111 (6th Cir. 1996) (finding that a likelihood of confusion as to affiliation could exist between two golf courses located in Nicholasville, Kentucky and Houston, Texas).

## 4. **Nominative use**

Tour 18 asserts that it has used the Plaintiffs' marks only to identify the Plaintiffs' golf holes that it copied and that such use, as a matter of law, does not create a likelihood of confusion. The district court treated this argument by Tour 18 as a species of the fair-use defense and considered it after finding a likelihood of confusion. See <u>Pebble Beach</u>, 942 F. Supp. at 1552-54. While a claim that the use was to identify the markholder's goods or services is analogous to the statutory fair-use defense, it is in actuality a claim that the use is noninfringing and thus creates no likelihood of confusion.[12]

above arguments would likely prevail. See <u>Elvis Presley Enters.</u>, 141 F.3d at 203 (noting that lack of intent does not weigh against a likelihood of confusion and fails to swing the balance away from infringement); <u>cf.</u> <u>id.</u> at 197-98 (noting that a trademark must be considered in context as used with other marks).

[12] The fair-use defense allows a party to use its own name or a descriptive term or device in the name or term's descriptive sense to describe its own goods or services. See 15 U.S.C. § 1115(b)(4). Use of the term or name as a mark defeats the defense. See <u>id.</u>; RESTATEMENT, <u>supra</u>, § 28 cmt. a. The fair-use defense is limited "to use of the original descriptive or personal name significance of a term." See <u>id.</u> § 28 & cmt. a; <u>see also</u> 15 U.S.C. § 1115(b)(4); <u>Soweco</u>, 617 F.2d at 1185. It does not apply to the use of a term as a mark to identify the markholder's goods or services. See <u>id.</u> §§ 20 cmt. b, 28 cmt. a. Unlike the use to identify the markholder's goods or services, a

Courts have long recognized that one who has lawfully copied another's product can tell the public what he has copied. See Saxlehner v. Wagner, 216 U.S. 375, 380 (1910); see also, e.g., Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700-01 (1st Cir. 1987) (stating that a copyist may use the originator's mark to identify the product that it has copied); Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc., 815 F.2d 500, 503 (8th Cir. 1987) (same); G.D. Searle & Co. v. Hudson Pharm. Corp., 715 F.2d 837, 842-43 (3d Cir. 1983) (same); Smith v. Chanel, Inc., 402 F.2d 562, 563 (9th Cir. 1968) (same); Societe Comptoir de l'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc., 299 F.2d 33, 35-37 (2d Cir. 1962) (same); RESTATEMENT, supra, § 20 cmt. b, at 209-10. Likewise, one can use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product. See, e.g., August Storck K.G. v. Nabisco, Inc., 59 F.3d 616, 617-18 (7th Cir. 1995); New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 306-09 (9th Cir. 1992); see also RESTATEMENT, supra, § 20 cmt. b, at 209-10; 3 MCCARTHY ON TRADEMARKS, supra, § 25:51-:52. This right to use a mark to identify the markholder's products--a nominative use--however, is limited in

---

fair use of a term may be protected even if a likelihood of confusion exists. See id. § 28 cmt. b. Otherwise, a markholder could "appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." Soweco, 617 F.2d at 1185.

that the use cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval.  <u>See, e.g.</u>, <u>August Storck</u>, 59 F.3d at 618; <u>New Kids on the Block</u>, 971 F.2d at 308; <u>Hypertherm</u>, 832 F.2d at 700-01; <u>Calvin Klein</u>, 815 F.2d at 503; <u>G.D. Searle</u>, 715 F.2d at 842; <u>see also</u> RESTATEMENT, <u>supra</u>, § 20 cmt. b, at 209-10; 3 MCCARTHY ON TRADEMARKS, <u>supra</u>, § 25:51-:52.

As the Ninth Circuit has recognized, where a nominative use of a mark occurs without any implication of affiliation, sponsorship, or endorsement--i.e., a likelihood of confusion--the use "lies outside the strictures of trademark law."  <u>New Kids on the Block</u>, 971 F.2d at 308.  In order to avail itself of the shield of nominative use, the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder.  <u>See</u> <u>id.</u> at 308[13]; <u>cf.</u> <u>B.H. Bunn</u>, 451 F.2d at 1263-64 (holding that references to a competitor's numbering system and prices are allowable only if solely used for comparison).  By definition, the defendant cannot use the mark to identify its goods because this would not be a

---

[13]  <u>New Kids on the Block</u> also held that "the product or service in question must be one not readily identifiable without use of the trademark."  971 F.2d at 308.  We decline to impose this requirement because, in the circumstance before us of direct comparative advertising used to identify what was copied,  it will always be satisfied.  We express no opinion as to whether this requirement should or should not be imposed in other circumstances of claimed nominative use.

39

nominative use, and it would also suggest affiliation, sponsorship, or endorsement.

The district court found that Tour 18 used the Plaintiffs' marks as service marks to name its own products and to distinguish them from those offered by other golf courses. See Pebble Beach, 942 F. Supp. at 1553. Based upon the prominent use of the Plaintiffs' marks in its advertising and promotional material, use of the marks on its menu, and use of the marks on signs directing players to each tee, Tour 18 has used the marks in ways suggesting affiliation, sponsorship, or approval. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 953-54 (7th Cir. 1992) (holding that use of a mark as an "attention-getting symbol" in advertising was not a fair use); Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 1248 (9th Cir. 1984) (holding that prominent placement of a mark on product was a trademark use); Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 937-38 (10th Cir. 1983) (same); cf. RESTATEMENT, supra, § 13 cmt. c, at 110 (noting that prominent use of a term in advertising is a way to indicate source--i.e., a trademark use). Therefore, the district court did not clearly err in finding that Tour 18 had used the Plaintiffs' marks in a service-mark context on its own products and services and did not err in denying Tour 18 the shield of nominative use.

In addition, Tour 18 argues that, because the allowable use of a mark in comparative advertising (a nominative use) will

normally result in a positive finding among a majority of the digits of confusion, the traditional likelihood-of-confusion analysis cannot be applied. However, implicit in this argument is a misunderstanding of the likelihood-of-confusion analysis. The digits of confusion "are not an end in themselves, and all are not of equal significance. The [digits] serve only as guides on the analytical route to the ultimate determination of whether confusion is likely to result." Champions Golf Club, 78 F.3d at 1122; see also Falcon Rice Mill, Inc. v. Community Rice Mill, Inc., 725 F.2d 336, 345 n.9 (5th Cir. 1984) ("[I]t is clear that some factors are more important than others and that they may have different weight in different cases."). Additionally, a court is not limited to considering only the standard digits of confusion and should consider other relevant factors in its analysis. See Elvis Presley Enters., 141 F.3d at 194. Furthermore, as noted earlier, a positive finding on a majority of the digits of confusion does not require a court to find a likelihood of confusion. See id. at 199. Therefore, the traditional likelihood-of-confusion analysis is applicable in a comparative-advertising situation, but the court should usually consider the nominative-use claim in conjunction with its likelihood-of-confusion analysis to avoid lowering the standard of confusion.[14] Because Tour 18 used the Plaintiffs' marks in

---

[14] We do not prescribe any particular method for this consideration because this case does not present a situation in

41

more than a merely nominative sense, a different approach would

not have altered the result.[15]

_____

which nominative use is a significant factor in the liability
determination.

[15] Because we affirm the district court's finding of
infringement, we likewise affirm its state-law unfair-competition
claim.  See Elvis Presley Enters., 141 F.3d at 193 (noting that
the likelihood-of-confusion determination under Texas law for
unfair competition based upon infringement is the same as under
federal law).

    Additionally, Tour 18 and the Plaintiffs' challenges to the
district court's findings on dilution have no merit.  Dilution
can be shown by way of two different theories: blurring and
tarnishment.  See 3 MCCARTHY ON TRADEMARKS, supra, § 24:67-:69; see
also RESTATEMENT, supra, § 25 (referring to the theories
respectively as "dilution" and "tarnishment").  The district
court found that Tour 18 had diluted the Plaintiffs' marks under
a theory of blurring, but that it had not diluted their marks
under a theory of tarnishment.  See Pebble Beach, 942 F. Supp. at
1566-67.  Tour 18's challenge to the district court's finding of
dilution by blurring was based only upon the protectibility of
the marks, which we affirmed above.  Moreover, Tour 18 did not
challenge whether the Plaintiffs' marks and trade dress were
sufficiently famous to support a dilution claim.  See RESTATEMENT,
supra, § 25(1)(a) & cmt. e.

    The Plaintiffs' challenge to the district court's finding of
no dilution by tarnishment rests upon the argument that Tour 18's
replicas are not as difficult or as beautiful as the original
golf holes and that Tour 18's claim that its golf holes are
replicas tarnishes their images.  The Plaintiffs' brief argument,
buried in their challenge to the injunction, is that this type of
association supports a finding of tarnishment.  The district
court recognized that this association may support a claim of
dilution by tarnishment but found that such dilution does not
exist in this case because any shortcomings would be attributed
to Tour 18 and not to the Plaintiffs.  See Pebble Beach, 942
F. Supp. at 1566-67; cf. Smith, 402 F.2d at 569 (noting that,
because the defendants make it clear that the product is their
own, "[i]f [the product] proves to be inferior, they, not [the
plaintiffs], will bear the burden of consumer disapproval").
Therefore, the district court committed no legal error which
would allow us to review its finding on dilution by tarnishment
under a less deferential standard of review than clear error, and

42

## 5.  **Effect of** Sears-Compco

In addition to its attack on the district court's
traditional trade-dress analysis, Tour 18 contends that it has
the unfettered right to copy the Plaintiffs' golf-hole designs
and lighthouse under the Intellectual Property Clause of the
Constitution.  See U.S. CONST. art. I, § 8, cl. 8.  Tour 18 points
to Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225 (1964), and
Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234 (1964), to
demonstrate that unfair-competition law cannot protect product
designs or configurations to which no current, valid patent
applies.  We disagree.

First, Sears and Compco, both decided the same day,
concerned the preemption of state trade-dress protection by
federal patent law and barred the use of state unfair-competition
laws to prohibit the copying of products that are not protected
by federal patents.  See Sears, 376 U.S. at 231-32 (copying of a
lamp); Compco, 376 U.S. at 237-38  (copying of a reflector for a
fluorescent light fixture).  This bar to state prohibitions on
copying includes nonfunctional designs and designs that have
achieved secondary meaning.  See Compco, 376 U.S. at 238.
However, the Supreme Court noted that "other federal statutory

the Plaintiffs have failed to demonstrate that the district court
clearly erred in its factual findings on dilution by tarnishment.
Therefore, we affirm the district court's finding of no dilution
by tarnishment because we have no definite or firm conviction
that a mistake has been made.

43

protection," in addition to the patent laws, may bar copying of a product. See id. at 238. In Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989), the Supreme Court reaffirmed its Sears-Compco holdings that limit state protection of product designs and noted that the application of Sears-Compco to nonfunctional product design must take into account competing federal policies as evidenced by the Lanham Act. See id. at 166. Thus, federal trademark protection is not limited by the preemption holdings in Sears-Compco. See Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 286 (7th Cir. 1998) (noting that the Sears-Compco and Bonito Boats holdings have no effect on the scope of federal trademark or unfair-competition law), petition for cert. filed, 67 U.S.L.W. 3152 (U.S. July 28, 1998) (No. 98-179).

Second, the federal trademark laws are "other federal statutory protection," and their protection of product designs and configurations does not conflict with the federal patent laws or the Intellectual Property Clause. The patent laws and the trademark laws have two entirely different and consistent purposes, addressing entirely different concerns. See generally Thomas & Betts, 138 F.3d at 283-89 (discussing the origins and competing policies of the patent and trademark laws). The patent laws serve (1) "to foster and reward invention," (2) "to promote[] disclosure of inventions to stimulate further innovation and to permit the public to practice the invention

44

once the patent expires," and (3) "to assure that ideas in the public domain remain there for the free use of the public." Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979); see also Duraco Prods., 40 F.3d at 1446 (noting that the policy of encouraging innovative designs is the province of the patent and copyright laws). The principal purposes of the trademark laws are to avoid consumer confusion and to protect the goodwill of the trademark owner's business. See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 198 (1985); Duraco Prods., 40 F.3d at 1446 n.10.

While the federal trademark laws provide a trademark or trade-dress owner indefinite protection unlike the limited-duration protection provided by the patent laws, traditional trade-dress analysis limits the scope of product designs or configurations that can be protected to avoid conflict between the two areas of law. See Kohler Co. v. Moen Inc., 12 F.3d 632, 642 (7th Cir. 1993) ("[A]ny conflicts between the patent laws and the Lanham Act should be resolved by a careful application of traditional bases for determining the propriety of trademark protection such as likelihood of confusion, functionality, and distinctiveness."); see also Qualitex, 514 U.S. at 164-65 (noting that the functionality doctrine prevents trademark law from inhibiting legitimate competition by protecting useful product features, which is the province of patent law); Duraco Prods., 40 F.3d at 1451; W.T. Rogers Co. v. Keene, 778 F.2d 334, 337 (7th

Cir. 1985) (noting that the defense of functionality prevents any conflict between the federal patent and trademark laws, especially with a trade-dress infringement suit requiring secondary meaning (i.e., distinctiveness) and a likelihood of confusion).

Third, in the more than thirty years since Sears-Compco, Congress and the courts have recognized that federal unfair-competition law provides protection to product designs and configurations consistent with the patent laws. See Bonito Boats, 489 U.S. at 166. Courts have developed federal unfair-competition law and have protected product designs and configurations. See, e.g., American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136 (3d Cir. 1986) (teddy bears); LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71 (2d Cir. 1985) (luggage); Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78 (3d Cir. 1982) (Rubik's Cube); Truck Equip. Serv. Co. v. Freuhauf Corp., 536 F.2d 1210 (8th Cir. 1976) (semi-truck trailer); see also 1 MCCARTHY ON TRADEMARKS, supra, §§ 7:54, 8:4-:5; cf. id. §§ 7:94-:95 (noting that, since Sears-Compco, product designs and configurations have been allowed registration on both the principal and supplemental registers). In the face of this developing protection for product designs and configurations, Congress reenacted in 1988 the definition of trademark to include "any word, name, symbol, or device, or any combination thereof," 15 U.S.C. § 1127. See Qualitex, 514 U.S. at 172-73. The Supreme

46

Court found in Qualitex that the reenactment of this language--along with its legislative history explicitly referring to the Trademark Commission's recommendation that the terms "symbol, or device" be left unchanged to allow registrations of color, shape, smell, sound, or configuration that function as a mark--undercut restrictive trademark precedent. See id. Thus, Congress and the Court have embraced a broad reading of the Lanham Act and its protections, which can encompass product designs and configurations.

For the above reasons, the Intellectual Property Clause, the federal patent laws, and the Sears-Compco-line of cases do not preclude federal trademark protection for product designs and configurations. Accord, e.g., Kohler, 12 F.3d at 639-41; Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts, 944 F.2d 1235, 1240-41 (6th Cir. 1991); Keene Corp. v. Paraflex Indus., Inc., 653 F.2d 822, 823 n.1 (3d Cir. 1981); see also Kohler, 12 F.3d at 640 n.10 (noting that the Lanham Act differs in many respects from the state unfair-competition law at issue in Sears-Compco); 1 MCCARTHY ON TRADEMARKS, supra, § 7:61. But see Kohler, 12 F.3d at 644-51 (Cudahy, J., dissenting); Ferrari, 944 F.2d at 1252-53 (Kennedy, J., dissenting); cf. Vornado Air Circulation Sys., Inc. v. Duracraft Corp., 58 F.3d 1498, 1510 (10th Cir. 1995) (finding that a nonfunctional feature that is part of a claim in a utility patent cannot be protected by federal

trademark law),[16] <u>cert. denied</u>, 516 U.S. 1067 (1996).[17]

Finally, if the acid test of any theory is how it works in

[16]  In <u>Vornado</u>, the court found that a feature was both patentable and nonfunctional.  <u>See</u> 58 F.3d at 1506.  The decision has been criticized for its narrow definition of functionality which does not take into account the utilitarian definition used by this court.  <u>See</u> 1 MCCARTHY ON TRADEMARKS, <u>supra</u>, § 7:68, at 7-134 to 7-136.  Therefore, if <u>Vornado</u> had applied this court's traditional trade-dress analysis, any conflict between the patent and trademark laws would have likely been avoided.

[17]  Tour 18 contends that this court's decision in <u>North Shore Laboratories Corp. v. Cohen</u>, 721 F.2d 514 (5th Cir. 1983), controls our resolution of the effect of <u>Sears-Compco</u>.  In <u>North Shore Laboratories</u>, the plaintiff and the defendant both made a brown tire-patch material, and the plaintiff argued that, based upon a consent judgment, the defendant should be prohibited from making a tire-patch material the same color as its own.  <u>See</u> <u>id.</u> at 516-18.  Solely by interpreting the judgment, the court determined that the defendant had not violated the consent judgment through the manufacture and sale of his product.  <u>See</u> <u>id.</u> at 518-21.  After resolving the question before it, the court alternatively considered whether it could have enforced the consent judgment if the judgment had prohibited the defendant's conduct.  <u>See</u> <u>id.</u> at 521-24.  The court looked to <u>Sears-Compco</u> for the public policy that the copying of unpatented products is permitted and promotes free competition.  <u>See</u> <u>id.</u> at 522.  It found that an injunction which barred the defendant's manufacture and sale of a brown tire-patch product would conflict with this public policy.

    <u>North Shore Laboratories</u>'s alternative holding that a product's color cannot be protected by federal trademark law has been overruled by subsequent Supreme Court authority.  <u>See</u> <u>Qualitex</u>, 514 U.S. at 174.  As discussed in the text, subsequent authority and Congress's reenactment of the broad language in the definition of a trademark demonstrate that the alternative rationale of <u>North Shore Laboratories</u> is inconsistent with the subsequent development of federal trademark law.  We note, however, that the result of the <u>North Shore Laboratories</u> decision's alternative holding would hold true today, without its discussion of <u>Sears-Compco</u>, because the court also found that the color of the tire-patch material lacked the necessary secondary meaning and was functional.  <u>See</u> <u>North Shore Lab.</u>, 721 F.2d at 522-23.  Each of these findings would independently bar Lanham Act protection to the color of the tire-patch product.

practice, we note that the application of traditional trade-dress analysis under the Lanham Act to the product configurations at issue here, the design of the Plaintiffs' golf holes, has effectively left intact Tour 18's right to copy the Plaintiffs' golf holes, barring only its copying of the lighthouse.

## B.  Remedies

On appeal, Tour 18 and the Plaintiffs challenge the district court's injunction as being too broad and too narrow, respectively.  The Plaintiffs also claim error in the district court's denial of an accounting of profits and an award of attorneys' fees.  We address each of these issues in turn.

### 1.  Injunctive relief

Under the Lanham Act, the district court has the discretion to enter an injunction to prevent continued infringement or unfair competition.  See 15 U.S.C. § 1116(a).  The Texas anti-dilution statute also provides for injunctive relief to remedy any dilution.  See TEX. BUS. & COM. CODE ANN. § 16.29 (Vernon Supp. 1998).  We review the district court's decision whether to grant or deny an injunction and the scope and form of the injunction for an abuse of discretion.[18]  See Frostie Co. v. Dr. Pepper Co., 361 F.2d 124, 126-27 (5th Cir. 1966).  In reviewing the

---

[18]  Whether an injunction is mandatory under the Texas anti-dilution statute is not before us because an injunction has been entered which, as discussed infra, does not permit diluting conduct.

49

injunction, it is important to note that, "'[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable.'" Taco Cabana, 932 F.2d at 1126 (quoting Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 390 (5th Cir. 1977)).

The district court entered an injunction against Tour 18 limiting its use of the Plaintiffs' marks, depictions of the lighthouse, Sea Pines's trade dress, and claims that original blueprints or maps were used and requiring it to remove the replica lighthouses from both of its courses.[19] The district

---

[19] The complete text of the district court's amended injunctive order follows:

> (1) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, the service marks "HARBOUR TOWN," "HARBOUR TOWN GOLF LINKS," or any depiction or photo of the Harbour Town lighthouse.

> (2) Defendant and all persons in active concert or participation with defendant are permanently enjoined from offering in connection with defendant's golf course services a replica, copy, or imitation of the Harbour Town lighthouse. Tour 18 is ordered to remove its replicas of the Harbour Town lighthouse from all Tour 18 golf courses. However, Tour 18 is not required to alter the playable surface of the golf holes in question.

> (3) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, the service marks "PEBBLE BEACH," "PEBBLE BEACH GOLF LINKS," "PINEHURST," or "PINEHURST No. 2," except that

defendant may use these marks only to the limited extent necessary to inform the public which golf holes it copied. To comply with this section of the injunction, Tour 18 may use plaintiffs' marks on its scorecard, yardage guide, and tee box signs. Additionally, Tour 18 may place these service marks in other printed materials only within a simple legend of the course's replicated golf holes. This legend shall include only the Tour 18 hole number, name of replicated hole, par, and yardage, similar to the legend contained within Tour 18's current promotional brochure, specifically plaintiff's exhibit 103. Tour 18 must remove all other superfluous uses of the marks listed in this section from its written materials, including but not limited to, the Tour 18 promotional brochures, mailers, advertisements in independent publications, and restaurant menu.

(4) Defendant shall place a disclaimer prominently and in bold lettering on the front of all advertisements, promotional brochures, scorecards, yardage guides, or other written materials provided to the public as a means of marketing Tour 18. The disclaimer shall disclaim any association, affiliation, sponsorship, or permission from the owners of the golf holes Tour 18 copied. Tour 18 shall maintain use of the disclaimers that currently appear on its tee box signs.

(5) Defendant is enjoined from using any advertisement or promotional statement claiming it used "original" blueprints, maps, or other data to construct its replica golf holes, except that defendant may use such a statement if it also includes a disclaimer clearly stating that it neither received the blueprints or maps from the owners of the original golf holes or that the owners of the original golf holes authorized Tour 18's use of such blueprints or maps.

(6) Defendant shall have thirty days from the entry of final judgment to comply with the provisions of this injunction.

(7) All additional relief requested by plaintiffs and defendant not specifically granted herein is denied.

court allowed Tour 18 continued use of Pebble Beach and Pinehurst's marks to inform the public of which golf holes it has copied, but the district court did not allow the same exception in relation to Sea Pines's marks.

Tour 18 argues that the district court's injunction is an abuse of discretion because (1) it limits legal activity that does not infringe or dilute the Plaintiffs' marks and (2) it is vague in its requirements. Specifically, Tour 18 argues that

   a. paragraph (1) impermissibly bars its use of Sea Pines's marks, "Harbour Town" and "Harbour Town Golf Links," without allowing for Tour 18's right to use the marks in truthful comparative advertising;

   b. paragraph (2) is vague as to what "remove its replicas of the Harbour Town lighthouse from all Tour 18 golf courses" means, in that it is unclear whether this means "remove the entire lighthouse structure including its foundation; alter the lighthouse to look like a water tower, a different lighthouse or something other than a lighthouse; or just paint the red stripes black";

   c. paragraph (3) is overly broad in that it only allows Tour 18 to use Pebble Beach and Pinehurst's marks to identify the golf holes it has copied and not in any other comparative advertising sense, such as to claim that its course is more fun than Pinehurst or Pebble Beach;[20] and

   d. paragraph (5) is overly broad in limiting Tour 18's use of claims of having used "maps or other data" in

_Pebble Beach_, 942 F. Supp. at 1577-78.

[20] Tour 18 also argues that the term "superfluous" in paragraph (3) is vague, but by our reading of the paragraph and "superfluous" in context, we find a clear meaning. The district court's requirement that all superfluous uses of the Plaintiffs' marks must be removed means that uses not expressly allowed are enjoined.

> recreating its golf holes in that this limitation
> precludes Tour 18 from making claims based upon maps
> and blueprints created by its own efforts.

Tour 18's challenges to paragraphs (1) and (3) will be considered in relation to the Plaintiffs' related challenges to the injunction. Tour 18's challenges to paragraphs (2) and (5) can be resolved by a cursory reading of the district court's opinion and of the injunction.

In relation to paragraph (2), "remove" means "to change or shift the location, position, station, or residence of," which does not include any connotation of alteration. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, supra, at 1921. The district court's amended injunction requires the complete removal of the structure from the golf course. This meaning is clear from the fact that the district court, in its original injunction, allowed for the parties to work out a solution that could include altering the structure, and when this failed, it ordered that the structure be removed. See Pebble Beach, 942 F. Supp. at 1573, 1576-77. The district court's decision to order the removal of the replica lighthouses when a satisfactory alteration could not be agreed upon was not an abuse of discretion.

In relation to paragraph (5), the plain language of the injunction does not bar all mention of any blueprints, maps, or other data. The injunction by its own language only limits references to "original" blueprints, maps, or other data, which does not include such items created by Tour 18. Tour 18 also

53

argues that its blueprint and map claims did not contribute to confusion, but the district court found that "[l]ikely consumer confusion is reinforced by Tour 18's advertisements and promotional materials which claim <u>original</u> blueprints and maps were used to copy plaintiffs' holes."  <u>Id.</u> at 1545 (emphasis added).  This finding is not clearly erroneous and supports this paragraph of the injunction.  Paragraph (5) of the injunction allows Tour 18 to refer to blueprints and maps it created, but it must not do so in a way that suggests that they are original documents or data obtained from the Plaintiffs or that the Plaintiffs authorized them to use such data.

The Plaintiffs challenge the district court's injunction because it allows Tour 18 to continue activities that contributed to the infringement and because the injunction fails to provide relief for their successful dilution claims.  Specifically, the Plaintiffs argue (1) that, as the district court itself found, using disclaimers to alleviate any problems is ineffective; (2) that the injunction allows infringing conduct and dilution to continue by permitting Tour 18's continued use of Pebble Beach and Pinehurst's marks; and (3) that all uses of the Plaintiffs' marks must be enjoined because Tour 18 was attempting to "cash in" on the Plaintiffs' reputations.

First, as to disclaimers, the district court found that disclaimers were ineffective due to their absence or inconspicuousness on advertisements and promotional materials and

54

due to Tour 18's "prominent use" of the Plaintiffs' marks.  See id. at 1551.  In contrast, conspicuous disclaimers that disclaim affiliation may reduce or eliminate confusion.  See, e.g., Soltex Polymer Corp. v. Fortex Indus., Inc., 832 F.2d 1325, 1330 (2d Cir. 1987), cited in Roho, Inc. v. Marquis, 902 F.2d 356, 361 (5th Cir. 1990); cf. Better Bus. Bureau of Metro. Houston, Inc. v. Medical Dirs., Inc., 681 F.2d 397, 405 (5th Cir. 1982) (requiring a disclaimer to obviate any confusion).  Therefore, the district court appropriately used disclaimers as part of its injunction.

Second, as to the permitted continued use of the Plaintiffs' marks, the district court is allowing Tour 18 to use the Plaintiffs' marks only to identify the golf holes it copied.  As noted in Part II.A.4, supra, this nominative use is outside the strictures of trademark law where it is done without any implication of affiliation, sponsorship, or approval.  In addition, a clear nominative use does not create any likelihood of confusion.  Further, it does not create any possibility of dilution by blurring because the use is one that links the mark to the markholder's goods or services.  Such a use strengthens rather than blurs the identification of a mark with the markholder's goods.  Cf. Smith, 402 F.2d at 569 (holding that the defendants' use of the plaintiffs' mark to identify the plaintiffs' product will not endanger the distinctiveness of the mark).  Therefore, the Plaintiffs' success on its infringement

55

and dilution claims does not compel enjoining the nominative use allowed by the district court.

Similarly, Tour 18's challenge to the district court's complete prohibition of the use of Sea Pines's marks in paragraph (1) of the injunction has merit. For the same reasons that support Tour 18's nominative use of Pebble Beach and Pinehurst's marks, Tour 18 should be free to use Sea Pines's marks, other than the lighthouse, in a nominative manner to identify the golf hole it has copied. Additionally, the removal of the lighthouse should not bar Tour 18 from identifying the golf hole as one copied from Harbour Town Golf Links. The lighthouse is part of Sea Pines's trade dress, and despite being used by some golfers as a target, it is not part of the playing aspect of the golf hole any more than a tree, a mountain, a cloud, power lines, or other features in the distance are part of the playing aspect of a golf hole. To find otherwise would be inconsistent with our holding that Tour 18 can identify its golf holes as copies of Pebble Beach and Pinehurst's golf holes despite differences in the surroundings. The district court was concerned "that the lighthouse is so intertwined with Harbour Town Hole 18 in golfer's [sic] minds that they constitute a single overall trade dress," Pebble Beach, 942 F. Supp. at 1577, but copying a product does not necessarily entail copying all aspects of its trade dress. The essential parts of Sea Pines's golf hole are copied, and Tour 18 should be allowed to tell the public that it has

56

copied the golf hole in a manner that does not cause fraud or deception.  Cf. Saxlehner, 216 U.S. at 380-81; Smith, 402 F.2d at 567-68.  Therefore, the injunction must be modified to allow Tour 18 to use Sea Pines's marks (other than the lighthouse), but Tour 18's use of Sea Pines's marks shall be limited in the same manner as its use of Pebble Beach and Pinehurst's marks is limited.

Additionally, Tour 18 contends that the district court fashioned the limitation on its use of the Plaintiffs' marks too narrowly by enjoining other proper nominative uses of the marks. Tour 18 opines that it should be allowed to advertise, "You can have more fun at TOUR 18 than at Pebble Beach," relying upon Better Business Bureau, 681 F.2d 397, and Trail Chevrolet, Inc. v. General Motors Corp., 381 F.2d 353, 354 (5th Cir. 1967).  In Trail Chevrolet, the defendants sold used Chevrolets and repaired Chevrolets, and they could not describe their business without being able to state those facts.  See 381 F.2d at 354.  Trail Chevrolet does not compel a broadening of the injunction in this case, in which the injunction allows Tour 18 the necessary use of the Plaintiffs' marks to describe its business and product as a collection of copies of the Plaintiffs and others' golf holes.

In Better Business Bureau, the district court completely enjoined any use of the plaintiffs' marks, which was considerably broader than the scope of conduct that the district court had adjudicated as misleading.  See 681 F.2d at 399, 404.  This court determined that this restriction was not "'reasonably necessary

57

to prevent the deception'" at issue and that the remedy should be to require disclaimers rather than completely prohibit use of the plaintiffs' marks.  See id. at 405-06 (quoting In re R.M.J., 455 U.S. 191, 203 (1982)).  In the instant case, Tour 18 has made generous use of the Plaintiffs' marks in the past--including prominent use in its advertising and promotional material and on its restaurant menus--which has been found to create a likelihood of confusion by suggesting approval.  Furthermore, even when consumers were exposed to Tour 18's disclaimers, the confusion continued to persist.  See Pebble Beach, 942 F. Supp. at 1549. Unlike in Better Business Bureau, the district court's injunction limits advertising and promotional activity by Tour 18 that has been adjudicated as misleading, and the use of disclaimers alone by Tour 18 has been found to be ineffective in preventing a likelihood of confusion.

Otherwise unassailable activities may be proscribed where a party has transgressed the governing legal standard.  See Taco Cabana, 932 F.2d at 1126; Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 705 (5th Cir. Unit A Oct. 1981); Kentucky Fried Chicken, 549 F.2d at 390; 5 MCCARTHY ON TRADEMARKS, supra, § 30:4.  The district court's injunction permits extensive use of the Plaintiffs' marks by permitting Tour 18 to use the marks to identify the holes it has copied, and the limitation on uses like the example urged by Tour 18 is

minimal.[21]  In light of the minimal nature of the limitation on

Tour 18's use of Plaintiffs' marks and the fact that disclaimers

alone are ineffective, the limitation imposed by the district

court is reasonably necessary to prevent deception based upon the

specific facts of this case.  The district court therefore did

not abuse its discretion by limiting Tour 18's use of the

Plaintiffs' marks as described in the injunction.

Third, the Plaintiffs' argument that an injunction must

issue because Tour 18 was trying to "cash in" on the Plaintiffs'

fame and reputation has no merit.  In both cases upon which the

Plaintiffs rely, this court enjoined use of trademarks which were

used to identify the defendants' services and were chosen and

designed specifically to appropriate the plaintiffs' reputations.

See National Ass'n of Blue Shield Plans v. United Bankers Life

Ins. Co., 362 F.2d 374 (5th Cir. 1966) (enjoining use of logos

similar to the plaintiff's even in a different color because in

black and white advertising the color would not distinguish the

logo); Aetna Cas. & Sur. Co. v. Aetna Auto Fin. Inc., 123 F.2d

582 (5th Cir. 1941).  In this case, the district court's

injunction, when modified as required above, will allow only uses

---

[21]  Our belief that the limitation is minimal is supported
by the fact that Tour 18 challenged only the complete prohibition
of its use of Sea Pines's marks and not the limitation on its use
of Pebble Beach or Pinehurst's marks in its motion to the
district court to alter or amend the final judgment.
Additionally, its argument to this court that the injunction is
too broad is brief and cursory.

59

which identify which holes were copied, thereby permitting Tour 18 to try to appropriate the reputation of the goods but not of the mark or markholder.  See Saxlehner, 216 U.S. at 380-81 (holding that it is proper to attempt to appropriate the goodwill of the goods, but not the name); see also Ferrari, 944 F.2d at 1243 ("'Where the copying by one party of another's product is not done to deceive purchasers and thus derive a benefit from another's name and reputation, but rather to avail oneself of a design which is attractive and desirable, a case of unfair competition is not made out.'" (quoting West Point Mfg. Co. v. Detroit Stamping Co., 222 F.2d 581, 586 (6th Cir. 1955))); Smith, 402 F.2d at 568-69 (noting that the opportunistic copyist's "free ride" serves an important public interest of offering comparable goods at lower prices and that the markholder is not entitled to monopolize the public's desire for the unpatented product).

For the reasons discussed above, we reject nearly all of the Plaintiffs and Tour 18's challenges to the district court's injunction.  In relation to Tour 18's use of Sea Pines's service marks, we modify paragraphs (1) and (3) of the injunction to read as follows:

> (1) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion, advertising, or sale of golfing services, any depiction or photo of the Harbour Town lighthouse.

> (3) Defendant and all persons in active concert or participation with defendant are permanently enjoined from using in connection with the promotion,

advertising, or sale of golfing services, the service marks "PEBBLE BEACH," "PEBBLE BEACH GOLF LINKS," "PINEHURST," "PINEHURST No. 2," "HARBOUR TOWN," or "HARBOUR TOWN GOLF LINKS," except that defendant may use these marks only to the limited extent necessary to inform the public which golf holes it copied.  To comply with this section of the injunction, Tour 18 may use plaintiffs' marks on its scorecard, yardage guide, and tee box signs.  Additionally, Tour 18 may place these service marks in other printed materials only within a simple legend of the course's replicated golf holes.  This legend shall include only the Tour 18 hole number, name of replicated hole, par, and yardage, similar to the legend contained within Tour 18's current promotional brochure, specifically plaintiff's exhibit 103.  Tour 18 must remove all other superfluous uses of the marks listed in this section from its written materials, including but not limited to, the Tour 18 promotional brochures, mailers, advertisements in independent publications, and restaurant menu.

## 2.  Profits and attorneys' fees

The district court denied the Plaintiffs' request for an accounting of profits and reasonable attorneys' fees.  See Pebble Beach, 942 F. Supp. at 1571-72.  The Plaintiffs argue that the district court abused its discretion in not awarding them profits and attorneys' fees, pursuant to 15 U.S.C. § 1117.[22]

---

[22]  The Plaintiffs also argue that Pebble Beach and Pinehurst must be granted an award of treble profits and attorneys' fees, pursuant to 15 U.S.C. § 1117(b).  However, § 1117(b), which provides penalties for the intentional use of counterfeit marks, does not apply to this case because (1) this simply is not a counterfeiting case and (2) despite the fact that Tour 18 intentionally copied the Plaintiffs' marks and trade dress, it did not intentionally infringe the Plaintiffs' marks by the use of counterfeit marks in attempting to use them to identify the golf holes it copied.  The case upon which the Plaintiffs rely does not stand for the proposition that any § 1114(1)(a) violation triggers the remedies in § 1117(b).  That case is a clear case of intentional counterfeiting.  See Dunkin' Donuts Inc. v. Mercantile Ventures, No. 93-8270, slip op. at 6 (5th Cir. Mar. 7, 1994) (unpublished), on remand, 32 U.S.P.Q.2d

61

### a. accounting of profits

Section 1117(a) of the Lanham Act entitles a markholder to recover the defendant's profits, subject to the principles of equity. See 15 U.S.C. § 1117(a); Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 584 (5th Cir. 1980). An award of the defendant's profits is not automatic, see Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 131 (1947); Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 919 (Fed. Cir. 1984), and is committed to the discretion of the district court, whose decision we review for an abuse of discretion, see id. at 917, 919. While this court has not required a particular factor to be present, relevant factors to the court's determination of whether an award of profits is appropriate include, but are not limited to, (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off. See Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc., 951 F.2d 684, 695 (5th Cir.) (citing Champion Spark Plug, 331 U.S. at 130; Bandag, 750 F.2d at 919; and Maltina, 613 F.2d at 585), reh'g denied, 966 F.2d 956 (5th Cir. 1992); RESTATEMENT, supra, § 37. Once an award is found to be appropriate, a

---

1460 (W.D. Tex. 1994).

markholder is only entitled to those profits attributable to the unlawful use of its mark.  See Texas Pig Stands, 951 F.2d at 696, reh'g denied, 966 F.2d at 957-58 (citing Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206 (1942), and Meier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 124 (9th Cir. 1968)).

The district court determined that an accounting of profits was inappropriate based upon (1) the lack of any evidence of lost or diverted sales, (2) the fact that the Plaintiffs only partially prevailed, and (3) the adequacy of injunctive relief. See Pebble Beach, 942 F. Supp. at 1571.  The Plaintiffs argue that the district court erred in considering the fact that they only partially prevailed and in its finding that there was no loss of goodwill.

The district court did err in placing weight on the fact that the Plaintiffs partially prevailed in denying an accounting of profits.  The Supreme Court has held that the burden is upon the defendant to show that he made no profit from the infringing use of the mark.  See Mishawaka, 316 U.S. at 206; see also 5 MCCARTHY ON TRADEMARKS, supra, § 30:65.  The Court acknowledged that the plaintiff may receive a windfall, but stated that, "where it is impossible to isolate the profits" from the infringing conduct, the windfall should go to the plaintiff rather than the wrongdoer.  See Mishawaka, 316 U.S. at 206-07. Therefore, the fact that the Plaintiffs only partially prevailed

63

does not weigh against an accounting of profits.

Nevertheless, the other relevant factors here still support the district court's denial of an accounting of profits.  There were no diverted sales nor palming off in this case, which are both significant factors.  See Texas Pig Stands, 951 F.2d at 695; see also Champion Spark Plug, 331 U.S. at 131 (affirming a denial of profits where no fraud or palming off was evident).  The district court also implicitly found that Tour 18's infringement was not willful.  See Pebble Beach, 942 F. Supp. at 1571-72 (noting that a case of willful infringement is normally an appropriate case for an award of profits and not finding such infringement and indicating, in its discussion of attorneys' fees, that Tour 18 did not intend to divert sales and had a good-faith belief that it could copy the golf holes and use the marks to identify what it copied).  Considering the lack of actual damages and the lack of an intent to confuse or deceive, injunctive relief satisfies the equities in this case.  See Champion Spark Plug, 331 U.S. at 131; Bandag, 750 F.2d at 917; see also Highway Cruisers of Cal., Inc. v. Security Indus., Inc., 374 F.2d 875, 876 (9th Cir. 1967) ("One may get just enough relief to stop the evil where it is apparent no great damage was done to the complainant.").  Therefore, we do not find that the district court abused its discretion in denying the Plaintiffs an accounting of Tour 18's profits.  The Plaintiffs' attack on the district court's apparent reliance upon no loss of goodwill does

64

not change this outcome, especially considering that it does not appear that the district court gave that fact much weight as it was only mentioned in the summary of its discussion of an accounting of profits and not in the discussion itself.  See Pebble Beach, 942 F. Supp. at 1571.

### b.  attorneys' fees

Under the Lanham Act, a court may award reasonable attorneys' fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a).  "An exceptional case is one where the violative acts can be characterized as malicious, fraudulent, deliberate, or willful."  Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1390 (5th Cir. 1996) (internal quotation marks omitted) (citing Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 491 (5th Cir. 1992)).  A district court should consider all the facts and circumstances in determining whether a case is exceptional.  See CJC Holdings Inc. v. Wright & Lato, Inc., 979 F.2d 60, 65 & n.2 (5th Cir. 1992) (looking to patent case law for guidance on what constitutes an exceptional case).   The prevailing party must demonstrate the exceptional nature of a case by clear and convincing evidence.  See CJC Holdings, 979 F.2d at 65 (citing Machinery Corp. of Am. v. Gullfiber AB, 774 F.2d 467, 471 (Fed. Cir. 1985)).  Once this showing has been made, the district court may award attorneys' fees at its discretion.  See id. (citing Texas Pig Stands, 951 F.2d at 684).  We review the district

65

court's findings as to whether a case is exceptional for clear error and its decision on whether to award attorneys' fees for an abuse of discretion.  See id.

An award of attorneys' fees under § 1117(a) generally "require[s] a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud."  Texas Pig Stands, 951 F.2d at 697.  Deliberate copying does not make a case per se exceptional.  See CJC Holdings, 979 F.2d at 65-66 (noting that an unpatented and uncopyrighted product can normally be copied).  A good-faith effort to create elements of dissimilarity may render a case unexceptional, see Taco Cabana, 932 F.2d at 1128 (citing with approval Roulo v. Russ Berrie & Co., 886 F.2d 931, 942 (7th Cir. 1989)), and "[a] district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense," CJC Holdings, 979 F.2d at 66 (citing Gustafson, Inc. v. Intersystems Indus. Prods., 897 F.2d 508, 511 (Fed. Cir. 1990)).  Additionally, lack of damages is an important factor in determining whether a case is exceptional.  See Texas Pig Stands, 951 F.2d at 697 n.23.

Relying upon (1) Tour 18's lack of intent to divert sales, (2) the lack of evidence of actual damages, (3) Tour 18's good-faith belief that it could copy the Plaintiffs' golf holes and use their marks to identify the golf holes it copied without causing confusion, and (4) the closeness of the case and the

66

mixed results achieved by both sides, the district court found that this case was not an exceptional case allowing for an award of attorneys' fees.  See Pebble Beach, 942 F. Supp. at 1571-72. The Plaintiffs argue that Tour 18 acted in bad faith with the requisite level of culpability, intentionally trading on the Plaintiffs' fame and reputations and that the district court erred in relying upon a lack of intent to divert sales and upon the mixed results of the case in determining that the case was not exceptional.

While a prevailing party's mixed results can be handled by apportioning the attorneys' fees among the claims, see 5 MCCARTHY ON TRADEMARKS, supra, § 30:103, the district court considered the mixed results as a makeweight indicating (1) that Tour 18's conduct was not so egregious that it had no defense and (2) that it had not taken an unreasonable position.  See Pebble Beach, 942 F. Supp. at 1572.  The fact that the outcome was mixed is relevant to whether a case is exceptional, but it should not be accorded great weight in the court's analysis.  As a makeweight, the district court did not weigh this fact too heavily in its determination of whether the case was exceptional.

As to the other circumstances of the case, the district court did not clearly err in finding a lack of the requisite level of culpability because there was no intent on Tour 18's part to divert sales, there were no actual damages proven, there

67

was no lack of good faith (as evidenced by Tour 18's use of disclaimers, though inadequate), and there were available legitimate uses of the Plaintiffs' marks to identify the Plaintiffs' products.  See Roulo, 886 F.2d at 942-43 (affirming a denial of attorneys' fees where the defendant attempted to create a similar product and made conscious efforts to create dissimilarities, which in the end were inadequate); cf. Texas Pig Stands, 951 F.2d at 697 n.23 (noting the significance of a lack of actual damages); Taco Cabana, 932 F.2d at 1127-28 (affirming an award of attorneys' fees where the defendant acted with the intent to reduce the plaintiff's sales); Springs Mills, Inc. v. Ultracashmere House, Ltd., 724 F.2d 352, 356 (2d Cir. 1983) (holding attorneys' fees appropriate where the defendant "adopted [the plaintiff's] mark and trade dress for no other purpose than to obtain a free ride" on the plaintiff's reputation (emphasis added)).  This case is unexceptional, and the district court therefore did not abuse its discretion in denying an award of attorneys' fees to the Plaintiffs.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment as modified.  Each party shall bear its own costs on appeal.